THE STATE ex rel. CITIZENS ELECTRIC LIGHTING & POWER COMPANY v. LONGFELLOW et al.

In Banc, June 18, 1902.

1. **Riparian Owner:** EXTENT. The riparian owner owns to low-water mark in Missouri, but no further. Beyond that is public domain, to which no one has the right to exclusive use.

2. ——: ——: WATER'S EDGE. Wherever this court has heretofore said that the riparian owner owns to "the water's edge," it must be understood to have meant "to low-water mark."

3. ——: BUILDINGS BEYOND LOW-WATER MARK. The riparian owner has no right to extend his buildings beyond the line of low-water mark, although his land is "bounded on the east by the Mississippi river." Nor can the city of St. Louis grant him permission to erect a building on his lot so bounded if that building is to extend beyond low-water mark line. The bed of the river, beyond low-water mark, is owned by the State of Missouri, in trust for the people; and the control of that part of it in front of the city, for purposes of navigation, commerce and the exercise of the police power, has been delegated by the State to the city of St. Louis, which has no more authority to give a citizen or corporation the exclusive use to the same than it has any other part of the public domain.

4. ——: ——: REFUSING PERMIT. The fact that the applicant asks for a permit to erect a private building, partly upon the public domain, is, in itself, enough to require public officers to refuse the permit.

Mandamus.

PEREMPTORY WRIT DENIED.

*John H. Overall* for relator.

No person or corporation, except those holding title through Roy, ever claimed this property or pretended that

its eastern boundary was not the Mississippi river. The city does not claim it was ever dedicated, condemned or belonged to it. That being the case, the excuse of the building commissioner that a part of the proposed structure will be east of the wharf line, must fall to the ground. It is true that by ordinance No. 5403, approved August 6, 1864, the city contemplated establishing a wharf two hundred and ten feet wide which would have taken all this property, but it never consummated its intention and the elevator of the St. Louis Grain Elevator Company, then in course of construction, was permitted to be finished, and in 1869 such improvements to be made as to cover more than that now about to be used by the plaintiff. The Elevator company was in possession of the property at time of the passage of the ordinance. In his oral argument counsel for respondents claimed that the statutes of limitation could not apply because the city is exempt from its operation. The law excepting the State, or a county, or a municipality from the operation of the statute of limitations, is as follows (sec. 4270, R. S. 1899): "statute not to extend to any lands given, granted, sequestered or appropriated to any public, pious, or charitable use." Sec. 7, chap. 191, R. S. 1865, approved and made the law of this State, March 20, 1866. It has been repeatedly held that this statute runs against the legal title of the State, or a county and a municipality, to lands held for public use, and that this statute is prospective in its operation and does not apply to cases where the right of entry accrued before it was enacted. Mississippi County v. Vowels, 101 Mo. 225; Ins. Co. v. St. Louis, 92 Mo. 422. If the Grain Elevator Company was not actually occupying, with its building, all the ground, that is immaterial, since it is provided by our statute that the possession of part in the name of the whole tract claimed, and exercising during the time of such possession the usual acts of ownership over the whole tract so claimed, shall be deemed a possession of the whole of such tract. Sec. 4266, R. S. 1899. But the stand

taken by the building commissioner that he properly refused to plaintiff the permit on the ground that part of the building will be east of the wharf line is not now insisted upon by the city counselor. He does insist, however, that the structure will interfere with the navigation of the Mississippi river, and that it will go below low water. On the part of plaintiff it is contended that the building will not in fact go below low water, and that even if it does, the owner of lands bounded by a navigable river has certain rights whether his title extends to the middle of the stream or not. Among these are free access to the navigable part of the stream. Yates v. Milwaukee, 77 U. S. 503; Meyer v. St. Louis, 82 Mo. 374; Railroad v. Stockyards, 120 Mo. 552; Railroad v. Illinois, 146 U. S. 445; Dutton v. Strong, 1 Black 23. By the testimony taken before the commissioner it plainly apears that persons have walked on dry land outside of the piles west of which plaintiff's building will be erected. But if that were not so, it is plain that plaintiff's building will not interfere with navigation, as it is shown that the boats pass far out in the stream.

*Chas. W. Bates* and *Wm. F. Woerner* for respondents.

(1) The relator's proposed structure would, if erected as contemplated, be an unlawful obstruction to navigation in the Mississippi river, which is a public highway. (a) In Missouri, a riparian owner does not own the soil beneath the water of a navigable stream, nor to the middle thereof; but his title extends only "to the water's edge." Cooley v. Golden, 117 Mo. 50; Railroad v. Stockyards, 120 Mo. 552; Vogelsmeier v. Prendergast, 137 Mo. 288; Hahn v. Dawson, 134 Mo. 591; Perkins v. Adams, 132 Mo. 139; Cox v. Arnold, 129 Mo. 337; Shively v. Bowlby, 152 U. S. 36 (distinguishing and modifying Yates v. Milwaukee, cited by relator); Gould on Waters, secs. 73, 76, 77. (b) Even if "to the water's edge" should be construed literally so as to extend to wherever the

water might at the time happen to be, so that the extent of relator's property would expand and contract according to the rise and fall of the river, yet the proposed edifice would at all ordinary stages of the water, and certainly during the regular high-water seasons, extend far beyond that line and into the navigable stream, so that under the most favorable conditions to relator, its structure would nearly (if not quite) always be an unlawful interference with navigation, impede the passage of vessels, and violate the easement of the public in the highway.    Railroad v. Stockyards, supra; Meyers v. St. Louis, 8 Mo. App. 272.    (c) But "to the water's edge" must, for the purpose of fixing riparian and public rights, be construed to mean to ordinary high-water mark, so that a stationary structure on the bank will not part of the time be a lawful and the rest of the time an unlawful one.    High-water mark is the "true boundary line," the banks are a part of the river, and title extends only to high-water line, the shore below belonging to the State.    Gould on Waters, secs. 42, 45, 76; Shively v. Bowlby, supra; Howard v. Ingersoll, 13 How. (U. S.) 415; McManus v. Carmichael, 3 Iowa 54; Lumber Co. v. United States, 55 Fed. 864.    (d)    The relator is not seeking to do anything that can be considered as the exercise of a riparian right.    A riparian owner has the right to navigate the stream and in order to gain access to the navigable part of the stream for navigation purposes, may build a pier, dock, wharf or landing.    That is the reason and extent of his right to construct; and even in so doing he must not encroach upon navigable waters, nor vessels be impeded or precluded from the use of any part of the river navigable in fact at the time.    But here the contemplated action of the relator company has not the semblance of exercising a riparian right.    It proposes to erect an immense solid manufacturing edifice of steel and stone in the bed and waters of a great water highway, and appropriate the river in order to do a tremendous private manufacturing business therein which is in no way connected

with the navigation or use of the river as a river for navigation purposes. The Mississippi river is not available for that purpose. Gould on Waters, secs. 150, 179; Railroad v. Stockyards, supra; Railroad v. Illinois, 146 U. S. 455; Lumber Co. v. United States, supra; Turner v. People Ferry Co., 21 Fed. 94; O'Fallon v. Daggett, 4 Mo. 343; Meyers v. St. Louis, supra. (2) (a) Relator can not make land by its own acts. The shallowing of the river and formation of land where there had formerly been deep water, especially at the southern end, caused by the unlawful driving of piles into the river bed to a point then below low-water mark, on which piles the warehouses of relator's grantors were built, confers no rights on relator to extend its title; the same is owned by the State. Dana v. Jackson Wharf Co., 31 Cal. 118; Railroad v. Illinois, supra. (b) Neither could relator have acquired title by prescription or adverse possession or limitation. R. S. 1899, sec. 4270 (enacted 1865, before erection of the structure in the river by relator's grantor). And the neglect or laches of the municipal officers, in permitting the unlawful acts of relator's grantor, can not confer the public rights to relator. St. Louis v. Railroad, 114 Mo. 13. (c) In fact, if the city permitted the structure relator now seeks to erect to be projected into the river, the effect would be to ruin the harbor and wharf below, and might subject the city to damages to persons injured thereby. Meyers v. St. Louis, supra. (3) The proposed plant of relator would be unlawful because in violation of the established harbor and wharf line, which the city had authority to establish. (a) The jurisdiction of the city extends to the middle of the channel of the Mississippi. Constitution of Missouri, art. 1, sec. 1; Charter of St. Louis, art. 1, sec. 2. And the city is given power over wharves and docks. Charter, art. 3, sec. 26, subd. 4. (b) The city, as against relator, had lawful authority to establish any wharf line as a reasonable regulation respecting the harbor, which

Vol. 169 mo—8

is not a capricious or arbitrary fixing of the wharf line so far from a navigable portion of the river as to amount to an unlawful interference with the rights of the riparian owner to reach the water from his land. While it is his right to have access to the navigable portion of the river, this right is limited by the power of the municipality to whom the power is delegated by the State; to make reasonable regulations establishing the point or line beyond which buildings or structures shall not be erected. Gould on Waters, sec. 138; Railroad v. Illinois, supra; Railroad v. Stockyards, supra; Prosser v. Railroad, 152 U. S. 59; Yates v. Milwaukee, 10 Wall. 497; Turner v. People Ferry Co., supra.

MARSHALL, J.—This is an original proceeding by mandamus, by which it is sought to compel the defendant Longfellow, as commissioner of public buildings in St. Louis, and the other defendants, as constituting the board of appeals from the commissioner of public buildings, to issue to the relator, a corporation organized under the laws of this State relating to manufacturing and business companies and engaged in the business of manufacturing and supplying electric light and power to its customers, a license to construct a building in that city in which to carry on its business. The petition, upon which the alternative writ of mandamus was issued, stated, that the relator owned "all of City Block No. 227 of the city of St. Louis, bounded on the north by Ashley street, and its continuation eastwardly to the Mississippi river, *on the east by said river,* on the south by the north line of Biddle street, continued eastwardly to said river, and on the west by Lewis street," and that the relator applied to the defendant, the commissioner of public buildings, "for a permit to construct a foundation for said building upon the real estate aforesaid owned by your petitioner," and that he refused to issue the permit, upon the advice of the city counselor, "that the commissioner of public buildings has no authority to grant

a permit for the erection of a building or structure extending beyond the established wharf line, and that any such structure is an unlawful obstruction of the harbor of Saint Louis." The said petition further alleges that relator purchased said real estate for the sum of $100,000, "the value of said premises being greatly enhanced by reason of the fact that it is bounded on the east by the Mississippi river, permitting the owner thereof to avail himself of the transportation of said stream, unless prevented from making connections with the navigable portion of said stream, which would be the result if the permit to construct petitioner's said building is wholly refused and the same be not ordered by this court."

The return admits that the relator owns City Block No. 227, "bounded on the north by Ashley street, on the east by the Mississippi river, on the south by Biddle street, and on the west by Lewis street," but denies that the relator made application for a permit to construct a building "upon the above described real estate," but on the contrary alleges "that it did make application to said commissioner of public buildings for the construction of a foundation for a building to be constructed partly on above-described real estate and partly in the Mississippi river, a public and navigable river, in the harbor of the city of St. Louis, a public highway; and that part of said building, according to the application and plans of relator submitted to the said commissioner, entered into the Mississippi river and harbor of St. Louis far below the high-water mark, and below low-water mark; and that the same as proposed, if built, would be a nuisance and an unlawful obstruction in said harbor and in said river, and materially interfere with the navigation thereof as a highway," and that for these reasons the commissioner of public buildings refused to issue the permit. The return further sets up that under its charter power the city of St. Louis, in 1864, established a general system of harbor and wharf lines for the protection and benefit of commerce and navigation, which wharf and harbor line

extended in front of relator's property, "and was and is far below high-water mark, and was and is below low-water mark; and is so located that boats, at all stages of water, can navigate said river up to said line; and that the same is a reasonable harbor regulation"; "that a building or structure extending in whole or in part east of the said line and into the harbor of the city of St. Louis and the Mississippi river, is an unlawful infraction of the said harbor regulations and interference with navigation and commerce. That relator's proposed foundation and building, if constructed as indicated by his said application and by the plans submitted to the commissioner of public buildings, would extend east of said line and into the harbor of the city and into the Mississippi river, and said commissioner and said board of appeals refused to grant a permit for the construction of said building by reason of the facts above stated."

The material averments of the reply are as follows:

"Plaintiff, for reply to respondents' return filed herein, admits that the Mississippi river is a public and navigable river, but denies that said building, when completed, will extend into the Mississippi river below low-water mark or that same as proposed, if built, would be a nuisance or an unlawful obstruction in said harbor or in said river, or materially interfere with the navigation thereof as a highway. Plaintiff says that in times of low water, the building plaintiff proposes to erect will not extend into said river, but will be sufficiently near thereto for plaintiff to receive the benefits of its riparian rights. Plaintiff says that in the prosecution of its business, it will require great quantities of water and coal, and that to receive the same it is necessary for it to reach the navigable portion of said river, and that can only be done by the construction of its said building in the place and upon the plans set forth in its said application to said building commissioner.

"Plaintiff denies that there is any wharf on the property upon which plaintiff proposed to erect its said building and

says that the city of St. Louis could only establish a wharf upon said property after condemnation or dedication, and that there has never been such condemnation or dedication, but plaintiff and its grantors have for more than one hundred and five years used and occupied said property upon which plaintiff's said buildling is proposed to be erected, having and using the said river to the navigable part thereof in front of said property."

A special commissioner was appointed to take testimony, and from the stipulation of the parties reported by him, the following facts appear:

"STIPULATION.

"It is hereby stipulated and agreed between plaintiff and respondents, as follows:

"*First.* A tract of land was granted by Spain to Antoine Roy prior to the retrocession by Spain to France of the territory of which the city of St. Louis now constitutes part; that it appears from the testimony of Louis Brazien, November 28, 1808, that Antoine Roy built his mill on said tract about 1798, and that this tract was confirmed by the old board of commissioners by certificates issued February 17, 1809, to Antoine Roy, claiming under himself (Commissioner's Minutes, vol. 3, p. 272; ib. p. 568), and patent certificate No. 238 was issued to him November 5, 1822 (Am. State Pap., vol. 2, p. 568). That said tract of land in subsequent conveyances to plaintiff's grantors and prior to January 23, 1864, was conveyed by a description which described the same as block 227 of the city of St. Louis, bounded on the north by the south line of Ashley street and its continuation eastwardly to the Mississippi river, on the east by the Mississippi river, on the south by the north line of Biddle street continued eastwardly to said river, and on the west by Lewis street. That by deed dated January 23, 1864, the tract of land under the

above description was conveyed to the St. Louis Grain Elevator Company, and that on May 27, 1901, said company executed and delivered to plaintiff a deed purporting to convey property described in the same way.

"*Second.* That plaintiff is a corporation organized for the purpose and with the powers alleged in the petition, and that the defendants are the officials as therein stated and that the ordinances referred to are truly set forth. That no objection was or is made to the form and manner of plaintiff's application to the building commissioner, and that the technical requirements of the ordinances were duly observed therein (except that it is not admitted that plaintiff had any right to receive a permit for a building or foundation at the location requested, nor that the said location was upon its premises).

"*Third.* That the said application for a building permit was made at the time stated in the petition, and refused, and that plaintiff did appeal to the board of appeals in the manner and time required by law, and that said board took such action as shall be considered and taken as tantamount to an approval of the action of the building commissioner and as a refusal to grant said requested permit to plaintiff.

"*Fourth.* Nothing in the above stipulation shall be construed as an admission by respondent that plaintiff at any time owned or now owns any tract, land or soil east of that owned by its grantor, the said St. Louis Grain Elevator Company, at the time of the conveyance to it of a tract of land described as above by the said deed dated January 23, 1864, nor that plaintiff at any time owned or now owns any interest in said property which at said time, January 23, 1864 (or since), may have formed part of the Mississippi river. Which questions are for determination by the court."

From the oral testimony reported by the special commissioner, the following facts are collated:

A.   The St. Louis Grain Elevator Company built an elevator on the land sometime between 1863 and 1865. This

elevator did not .extend to the water's edge, nor to the eastern line of the premises.    At that time there was a "bluff bank" in front of the premises and ·the water was deep, so that it was navigable up to the. bank at all stages of the water.    Afterwards in 1870, the elevator company built what it called the eastern additions or "river warehouses." These extended eastwardly from the main elevator into the river about eighty-five or ninety feet, and rested upon pilings and extended out into the river beyond both high-water and low-water mark. These additions were built for the double purpose of increasing the capacity and to furnish better facilities for loading barges to their full capacity.    They originally extended about five hundred feet from north to south, and afterwards the elevator rented about three hundred feet of the wharf from the city and extended their "river warehouses" over that also. They formed an obstruction to the usual flow of the river, and at the north end of the building where the water struck the building they threw rock into the river and caused it to flow around and in front of the building.    So that afterwards, when the water was at zero on the government gauge, there was a strip of dry land at the south end of the buildings about one hundred to one hundred and fifty feet long and about five feet wide, but boats could always land at the elevator and be loaded thereat.    On April 2, 1902, the water was nine feet deep at the southeast corner of the building.    There is a difference of thirty-nine feet between zero and high-water mark, and the river is liable to rise that much half a dozen times a year.    This condition existed until the elevator was destroyed by fire in April, 1901, and since then only the charred piles remain in the river in front of the said premises.

B.    The eastern wall of the building proposed to be built by the relator, and which is of stone and steel, would extend out seventeen or eighteen feet beyond and east of the harbor line at the southeast corner of the proposed building, and about five feet less than that at the northern end of the building.

The relator showed that it proposed to use the building as a powerhouse and to generate electricity; that it would need two hundred and fifty tons of coal a day, which it desired to unload directly from barges into its building; that it would use two and one-half million gallons of water an hour, which it desired to take direct from the river; that its object in desiring to build its building out into the river was to have access to the navigable part of the river so as to get in its supply of coal and so as to "get plenty of water for the plant," and also because if the building was not built as far out east into the river as is proposed, "we would not have the room to put in the generators, bailers, etc.; we are cramped as it is to put the machinery in the space we have that it is designed for."

C.   The river in front of the proposed building is from a quarter to a half mile wide, and the channel is several hundred feet east of the building.

D.   The charter of St. Louis established the eastern boundary of the city in the middle of the main channel of the Mississippi river, and gives the city power over the harbor, the right to erect, repair and regulate public wharves and docks, to license ferries and other watercraft, to regulate the anchoring and mooring of all vessels and wharfboats, and the landing of all watercraft at the improved parts of the wharf, and to construct all needful improvements in the harbor. [Par. 4, sec. 26, art. 3, and art. 9, of city charter.]   In pursuance to this authority the city passed an ordinance establishing a wharf line in front of the premises owned by relator, but which was altogether in the river and did not rest upon any land owned by the relator.

The case made, then, is this:   The relator owns a block of ground in the city of St. Louis, which is bounded on the east by the Mississippi river.   It asks this court to compel the commissioner of public buildings of St. Louis, to issue to it a permit to erect a building which will extend out eastwardly into the river, eighty-five feet beyond high-water mark, and from

twelve to eighteen feet beyond low-water mark. The proposed building is to be used as a powerhouse and to generate electricity. The reason it asks this is not only to enable it to unload coal directly from barges into its building, and to "get plenty of water for its plant," but also because it has not space enough on its premises for all its machinery and needs this additional space.

The city refuses to issue the building permit, both because the relator does not own the land it proposes to occupy with its buildings, and because such land constitutes a part of the Mississippi river, a navigable, public highway, and is a part of the harbor of St. Louis, over which it has, *sub modo,* the jurisdiction and power of the State of Missouri, and which it is charged with the public duty of preserving for navigation and commerce, and that the relator proposes to use such part of such harbor for its private business and not for navigation or commerce.

It will be observed that the relator charges in its petition that it proposes to build upon City Block No. 227, which it describes as bounded on the east by the Mississippi river, and that in its reply to the charge of the city that it proposes to build out into the Mississippi river, it denies that it intends to build beyond low-water mark. It will also be noted that the fact is that the foundation of its proposed building would be from twelve to eighteen feet below low-water mark and from eighty-five to ninety feet beyond high-water mark.

## I.

"A fresh-water river, like a tidal river, is composed of the *alveus,* or bed, and the water; but it has banks instead of shores. The banks are the elevations of land which confine the waters in their natural channel when they rise to the highest and do not overflow the banks; and in that condition of the water the banks, and the soil which is permanently sub-

merged, form the bed of the river. The banks are a part of the river-bed, but the river does not include lands beyond the banks, which are covered in times of freshets or extraordinary floods, or swamps or low grounds which are liable to overflow, but are reclaimable for meadows or agriculture, or which, being too low for reclamation, though not always covered with water, may be used for cattle to range upon, as natural or uninclosed pasture. Fresh rivers, although not subject to the daily fluctuations of the tide, may rise and fall periodically at certain seasons, and thus have defined high and low-water marks. The low-water mark is the point to which the river recedes at its lowest stage. The high-water mark is the line which the river impresses upon the soil by covering it for sufficient periods to deprive it of vegetation and to destroy its value for agriculture."

This comprehensive statement is taken from Gould on Waters (3 Ed.), section 45, and is based upon the weight of authority and largely upon the decision of the Supreme Court of the United States in Howard v. Ingersoll, 13 How. (U. S.) 381.

The same author, in section 54, says: "Nature is competent, it has been said, to make a navigable river without the aid of the Legislature; and it is now established in this country, overruling the earlier decisions, that the public have a right of passage over all fresh-water streams which are by nature susceptive of general use, and that in general those rivers are public and navigable in law which are navigable in fact."

A riparian owner is entitled to access to the waters and to the use of the waters for all purposes not inconsistent with the public right of navigation thereon. If the banks of the rivers were "bluff" or perpendicular banks, no practical difficulties or perplexing problems, as to the ownership of land between high-water and low-water marks, would arise. But nature has wisely provided, in the interest of commerce and transportation, that the banks of all rivers shall slope at some places,

and thus the question of the rights of a riparian owner and of the public, to the land that lies between high and low-water marks, becomes at times of the gravest importance.   In England and in some of the Eastern States, the rule is that "the title to the bed of the river *ad filum aquae* is in the riparian proprietors in severalty and not in common."  [Gould on Waters, sec. 46; Ibid., sec. 56.]   In other and in most of the Western States the English rule has been held to be inapplicable to the conditions in those States, especially where there are large navigable rivers.   [Ibid, sec. 56, et seq.]

The same author, in section 76, says:   "According to all the decisions of those States in which the lands were originally surveyed under the laws of the United States, the lines run by the United States surveyors along the river banks are not lines of boundary, the owners of the adjacent lands taking at least to the water's edge, thus giving them the benefit of the river frontage, with right of access to the river, and the incidents of riparian proprietorship as to the use of the water. The true boundary line of a navigable stream or lake is the point to which the water usually rises in ordinary seasons of high water.   The position of that line is a question of fact for the jury.   .   .   .   The tendency is to accept the decisions of the Supreme Court of the United States in Railroad v. Schurmeir (7 Wall. 272), and Barney v. Keokuk (94 U. S. 324), in those States in which the rule extending the riparian owner's title to the center of the stream had not been previously adopted.   These decisions have been followed in Missouri, Minnesota, Arkansas, Oregon, Nevada, Kansas, Florida and California."

In Railroad v. Schurmeir, 7 Wall. l. c. 287, 289, the Supreme Court of the United States held that riparian owners on inland navigable rivers, that have no tide, like the Mississippi river, own only to the water's edge, and that grants of land by the United States bordering on such rivers conferred a title only to the water's edge, and that the title to the bed

of the rivers is in the public and is deemed to be and remain public highways, but that the riparian owner may "construct suitable landings and wharves for the convenience of commerce and navigation, as is accorded riparian proprietors bordering on navigable waters affected by the ebb and flow of the tide."

The rule laid down by the Supreme Court of the United States is that when land is granted by the United States as bounded by a navigable river, the grantee's title extends only to high-water mark, and the river, including the soil submerged by the waters and also the banks, remain the property of the ceding power. [Howard v. Ingersoll, 13 How. 381, l. c. 415.]

In Shively v. Bowlby, 152 U. S. l. c. 57, the Supreme Court of the United States, speaking through Mr. Justice GRAY, said: "The title and rights of riparian or littoral proprietors in the soil below high-water mark, therefore, are governed by the laws of the several States, subject to the rights granted to the United States by the Constitution. . . . Grants by Congress of portions of the public lands within a Territory to settlers thereon, though bordering on or bounded by navigable waters, convey, of their own force, no title or right below highwater mark, and do not impair the title and dominion of the future State when created; but leave the question of the use of the shores by the owners of uplands to the sovereign of each State, subject only to the rights vested by the Constitution in the United States. The donation land claim, bounded by the Columbia River, upon which the plaintiff in error relies, includes no title or right in the land below high-water mark."

In the recent case of Packer v. Bird, 137 U. S. 661, the Supreme Court of the United States, following the rule adopted by the courts of the State where the question arose, held that a patent from the United States, which in terms bounds the land granted on the margin of a navigable fresh-water stream, conveys only to the water's edge.

The first case involving this question that arose in this State was O'Fallon v. Daggett, 4 Mo. 209, decided at the June term, 1836, the opinion being by McGirk, J.   The case arose under a Spanish grant.   The case was this:   Mullanphy's grantor was granted certain land by the Spanish government. The grant expressed to be "to the water's edge."   The city attempted to lay out a street along the river front between high and low-water mark, across the land, without making compensation therefor.   The defendant claimed the right to use the land that lay below high-water mark, for purposes of commerce and navigation, for exposing fish for sale, for drying fish nets and for repairing vessels.   It was held:   First, that the city had no power to establish the street without compensation to the owner thereof.   Second.   That under the Spanish law governing the grant of land bounded by a navigable river, the grantee owned to the water's edge; that the stream was a public highway; that while the Spanish law provided that "though the dominion or property of banks of rivers belongs to the owner of the adjoining estate, nevertheless, every man may make use of them to fasten his vessel to the trees that grow thereon, or to refit his vessel or to put his sails or merchandise there.   So fishermen may put and expose their fish for sale there, and dry their nets, or make use of the banks for all like purposes which appertain to the art or trade by which they live," still this must be limited to cases of emergency, and can not be justified on any other ground; that "the King of Spain granted the bank to Gosti, and Mullanphy under him is the owner, he must not for that obstruct navigation of the river; he can not project piers into the river, nor build houses on the bank, so as to injure the navigation of the same.   So, on the other hand, the navigator can not obstruct the owner's enjoyment of the same beyond the reasonable limits of necessity imposed on him at the time."   This case is cited approvingly in the elaborate and learned opinion of Harris, J., in Steamboat Magnolia v. Marshall, 39 Miss. l. c. 128.

The question again came before this court in Benson v. Morrow, 61 Mo. 345, at the October term, 1875. This court, speaking through NAPTON, J., said: "The ancient doctrine, distinguishing navigable and non-navigable rivers, by their position above or below the tide water, is still adhered to in most of the older states; but it is distinctly repudiated by the Supreme Court of the United States in Railroad v. Schurmeir, 7 Wall. 272, and, indeed, could not well be reconciled with either the acts of Congress in relation to our large rivers, or the system of public surveys adopted by Congress."

The learned judge referred to the fact that Chancellor KENT lays down the rule that as to non-navigable rivers (by which he means there is no ebb and flow of the tide) the riparian owner prima facie, and unless restrained by the terms of the grant, owns "*ad filum medium aquae*," "subject to an easement for the public to pass along and over it with boats, rafts and river craft." But after so referring he very significantly added: "But the application of the principle as made by the text-writers and judges as to non-navigable streams, can not be transferred to our great public rivers. The proprietor of land on the banks of the Missouri river does not own *ad filum aquae*, but only to the water's edge, though undoubtedly still entitled to whatever increment may be added to his land. He is not, however, the owner of an island that springs up in the midst of the stream, whether the island be on one side or the other of the thread of the river. He goes only to the margin of the river (The Schools v. Risley, 10 Wall. 110; Railroad v. Schurmeir, 7 Wall. 272; Yates v. Milwaukee, 10 Wall. 504). Nor is the doctrine concerning rivers, deemed navigable at common law, altogether applicable to our western rivers. That doctrine is, that the right of the soil, of owners of land bounded by the sea or navigable rivers, where the tide ebbs and flows, extends to high-water mark, and the shore below common but not extraordinary high-water mark, belongs to the State, as trustee of the public; and in England, the

crown, and in this country the people, have the absolute proprietary interest in the same (3 Kent Com. (12 Ed.), 427). *The terms high-water and low-water mark can hardly be regarded as applicable to the Missouri river."* The last sentence is italicised to call special attention to the importance and significance of the principle announced.

The question again underwent extensive investigation in Cooley v. Golden, 117 Mo. 33, and the case of Packer v. Bird, 137 U. S. 661, and Benson v. Morrow, 61 Mo. 347, were referred to, and the rule there announced that a riparian owner owns "only to the water's edge," was again affirmed and adhered to. [See also Rees v. McDaniel, 115 Mo. 145, and Railroad v. Stockyards, 120 Mo. 541.]

In Hahn v. Dawson, 134 Mo. l. c. 591, this court, per Gantt, J., said: "In Missouri the riparian owner only owns to the water's edge. He has no claim whatever to the soil under the river."

It will be observed that these cases hold that the riparian owner owns "only to the water's edge." This is indefinite or else it is a variable line. If it means high-water mark, then when the water is low, he would not own to the water's edge. And if it means low-water mark, then the owner is entitled to place anything he pleases on the land between high-water mark and low-water mark, whether it interferes with commerce and navigation or not. And if it means low-water mark, then the definition of a river, that it includes the soil permanently submerged and the banks as high as ordinary high-water mark, as given by Gould on Waters, section 45, and by the Supreme Court of the United States in Howard v. Ingersoll, 13 How. l. c. 415, does not accurately define.

In McBaine v. Johnson, 155 Mo. l. c. 201, and in Moore v. Farmer, 156 Mo. l. c. 47, the author hereof treated these cases as meaning the low-water mark, because that is the only line always touched by the water's edge, and it is the only construction that can be given to the term "water's edge" that

will at all times insure the right of the riparian owner to access to the river, and which will so define his rights as to prevent possible difficulties which would otherwise arise, e. g., that, if the riparian owner erected a permanent structure between high-water and low-water mark, he would be innocent of wrongdoing when the river was at high-water mark, but would be a trespasser when the river was at low-water mark. ' The erection of a permanent structure between high and low-water mark would not materially interfere with navigation.

This view harmonizes with what was said by this court in O'Fallon v. Daggett, 4 Mo. l. c. 212, where in answer to the claim that the public and not the riparian owner owned the land below high and low-water mark, it was held that the riparian owner owned such land subject to the right of the public to use it for necessary purposes of navigation; that although the riparian proprietor so owned it, "he must not, for that, obstruct the navigation of the river; he can not project piers into the river, nor build houses on the bank, so as to injure the navigation of the same. So, on the other hand, the navigator can not obstruct the owner's enjoyment of the same beyond the reasonable limits of necessity imposed on him at the time," and that a city, in which such land lies, can not establish a street between high-water and low-water mark in front of such riparian owner's land, without paying such owner just compensation therefor.

So that in this sense it must be understood that the riparian owner owns to low-water mark in Missouri and that such is the meaning of the term "water's edge" heretofore used by this court.

It only remains to apply these principles to the case at bar. The relator avers that it only asked a license to erect a permanent building of stone, brick and steel on City Block 227, which block is bounded on the east by the Mississippi river, and denied the charge of the city that its proposed building would extend into the Mississippi river and beyond its

eastern boundary line, but averred that it would not extend beyond low-water mark. The facts are, however, as the city claims, that the eastern foundation wall of the proposed building will be from twelve to eighteen feet east of low-water mark. This soil is owned by the State of Missouri, in trust for the people, and the control of it, for purposes of navigation, commerce and the exercise of the police power, is delegated by the State to the city of St. Louis. The relator has no more right to its use for private purposes and gain than it has to the use of any other part of the public domain, and the city can no more grant such use to relator than it could rent out a public park to a private citizen for pasturage purposes, and has less power to do so than it has to lease the city hall to a citizen for an electric powerhouse and generator. [Belcher Sugar Refining Co. v. St. Louis Grain Elevator Co., 82 Mo. 121; Idem, 101 Mo. 192; Glasgow v. St. Louis, 107 Mo. 198.]

The fact that relator asks a permit to erect a private building partly upon the public domain is, in itself, enough, to require public officers to refuse the permit, and the courts will not compel any public officer to grant any one a permit to do an unlawful act.

The fact that without such encroachment upon the public domain the relator's premises are not adequate to its necessities or wants, does not alter the case. The relator says this property has a peculiar value which caused it to pay one hundred thousand dollars for it. Be it so, the relator got all it paid for. If the premises had been larger the price would doubtless have been greater. So the matter ends.

It follows that because the relator seeks to extend its building below low-water mark, and to place it partly upon public property, it has failed to show itself entitled to the relief asked. The peremptory writ of mandamus is therefore denied. All concur.