589 P.2d 540

### HECKMAN RANCHES, INC. and Heckman Cattle Co., corporations, Plaintiffs-Appellants,

v.

### STATE of Idaho, a Commonwealth, By and Through the DEPARTMENT OF PUBLIC LANDS and the State Board of Land Commissioners, Gordon C. Trombley, State Land Commissioner, Defendants-Respondents.

No. 12316.

Supreme Court of Idaho.

Jan. 4, 1979.

W. C. MacGregor, Jr., William J. Dee, Grangeville, for plaintiffs-appellants.

Wayne L. Kidwell, Atty. Gen., Ursula I. Kettlewell, Asst. Atty. Gen., Boise, for defendants-respondents.

McFADDEN, Justice.

This is an action to quiet title to land near Whitebird, Idaho. The disputed area encompasses approximately 12 acres of land located between the mainstream and the eastern survey meander line of the Salmon River, and includes a secondary or overflow channel of the river. (See annexed exhibit). The primary issue on appeal is the location of the natural or ordinary high water mark of the Salmon River in relation to the disputed area. The district court established the natural or ordinary high water mark of the river, and quieted title accordingly and ordered the plaintiffs to fence the property. The judgment of the district court is affirmed in part and reversed in part.

Lands along both sides of the Salmon River were surveyed in 1893 and the course of the river was meandered by meander lines drawn by the original government surveyor in 1893. The eastern meander line along the disputed portion of the river, however, is a significant distance from the mainstream of the river and approximates the eastern bank of the secondary or overflow channel. This overflow channel is east of the mainstream and with the mainstream encircles the land in dispute. When the channel is filled with water from the mainstream during spring runoff, the higher ground above the channel appears as an "island." The controlling government survey of this portion of the river was made in June, 1893, during spring high water runoff. The surveyor described the disputed area as an unsurveyed "island" within the mainstream of the Salmon River.

In 1968 defendants-respondents State of Idaho and the State Board of Land Com-

missioners entered into a riverbed lease with the State Department of Highways for the removal of sand and gravel from the bed of the Salmon River. Pursuant to this lease, rip-rap materials were removed from the disputed area in 1974.

Plaintiffs-appellants Heckman Ranches Inc. and Heckman Ranches Co. initiated the present action on March 7, 1974, to recover damages for removing the rip-rap materials and to quiet title to the disputed property.[1] Appellant Heckman Ranches Inc. owns three fractional lots on the eastern side of the Salmon River adjacent to the disputed property that were created as a result of the meandered survey of the eastern bank of the river. Appellants utilize the disputed area as a heifer calving ground during the early spring before high water runoff. Appellants allege that the boundary line of their lots extends westward beyond the meander line to the "natural or ordinary high water mark" of the Salmon River, which they allege is near the mainstream of the river.

The district court entered its memorandum opinion, findings of fact, conclusions of law and a decree establishing the natural or ordinary high water mark of the Salmon River and quieting title to the property. The district court's findings and conclusions are summarized in relevant part as follows: the Salmon River is a navigable river; the "island" area was in existence in 1890 when Idaho was admitted to statehood; whenever the flow of the Salmon River at the Whitebird stream gauging station exceeds 39,300 cubic feet per second, water flows in the secondary channel through the "island" area; based on waterflow measurements at the Whitebird stream gauging station for the past 15 years, water flows in the secondary channel an average of 31.7 days per year; the area noted as an "island" by the surveyor in 1893 is not an island as legally

1. Following a pre-trial hearing, the district court severed the damages issue pursuant to I.R.C.P. 42(b) and determined only the ownership issue. This appeal thus only involves the action to quiet title, since the ruling in favor of respondent moots the issue of damages and the judgment is final.

defined because water does not continuously flow in the secondary channel; the "island" area was not included in the land patent conveying appellants' three fractional lots; the natural or ordinary high water mark is depicted by Plaintiff's Exhibit No. 22, Defendant's Exhibit No. 51 and Exhibit (B) of the district court; the natural or ordinary high water mark of the river is above the secondary channel and encircles the "island" area; the disputed lands are below the natural or ordinary high water mark of the Salmon River; appellants' northwestern boundary line coincides with the established natural or ordinary high water mark; respondent State of Idaho owns the land in the bed of the Salmon River extending to the natural or ordinary high water marks as established by the district court; and appellants shall be required either to fence the boundary of their property to prevent the continued trespass of their cattle on state owned property or to acquire a lease authorizing their continued occupancy of the property.

On appeal from the judgment of the district court, appellants present thirty-seven assignments of error involving three main issues: (1) the location of the natural or ordinary high water mark of the Salmon River; (2) appellants' title by adverse possession; and (3) appellants' duty to "fence-in" their cattle. Because of their complexity, each principal issue is addressed separately below.

## I.

## NATURAL OR ORDINARY HIGH WATER MARK

■ "Meander lines" established by government survey are survey lines drawn along the banks of navigable streams for the purposes of defining the sinuosities of the banks of the stream, and as the means of ascertaining the price to be paid by the purchaser to the government for meandered fractional lots. Smith v. Long, 76 Idaho 265, 281 P.2d 483 (1955); Younie v. Sheek, 44 Idaho 767, 260 P. 419 (1927); Stroup v.

Matthews, 44 Idaho 134, 255 P. 406 (1927); A. B. Moss & Bro. v. Ramey, 25 Idaho 1, 136 P. 608 (1913); Ulbright v. Baslington, 20 Idaho 539, 119 P. 292 (1911); Scott v. Lattig, 227 U.S. 229, 33 S.Ct. 242, 57 L.Ed. 490 (1912) (Rev'g 17 Idaho 506, 107 P. 47 (1910)); Johnson v. Johnson, 14 Idaho 561, 95 P. 499 (1908); Johnson v. Hurst, 10 Idaho 308, 77 P. 784 (1904). Ordinarily, meander lines established by surveys of public lands bordering on navigable rivers or streams are not boundary lines, rather the river or stream forms the boundary line. Smith v. Long, supra; Younie v. Sheek, supra; Stroup v. Matthews, supra; Johnson v. Hurst, supra. To this general rule is added an exception for special circumstances that show an intent to limit the grant of a land patent to the meander line only. United States v. Lane, 260 U.S. 662, 43 S.Ct. 236, 67 L.Ed. 448 (1923); Producers Oil Co. v. Hanzen, 238 U.S. 325, 35 S.Ct. 755, 59 L.Ed. 1330 (1915); Niles v. Cedar Point Club, 175 U.S. 300, 20 S.Ct. 124, 44 L.Ed. 171 (1889); Ritter v. Morton, 513 F.2d 942 (9th Cir. 1975), cert. denied, 423 U.S. 947, 96 S.Ct. 362, 46 L.Ed.2d 281 (1975); United States v. 100 Acres of Land, etc., Marin Cty., Cal., 468 F.2d 1261 (9th Cir. 1972), cert. denied, 414 U.S. 822, 94 S.Ct. 119, 38 L.Ed.2d 54 (1973). It is settled law in this state that title to the bed of a navigable river or stream between the natural or ordinary high water marks is held by the state. Driesbach v. Lynch, 71 Idaho 501, 234 P.2d 446 (1951); Gasman v. Wilcox, 54 Idaho 700, 35 P.2d 265 (1934); Raide v. Dollar, 34 Idaho 682, 203 P. 469 (1921); Northern Pacific Ry. v. Hirzel, 29 Idaho 438, 161 P. 854 (1916); Callahan v. Price, 26 Idaho 745, 146 P. 732 (1915).

■ The term "natural or ordinary high water mark" of a stream or river is defined by I.C. § 58–104(9) as "the line which the water impresses on the soil by covering it for sufficient periods to deprive the soil of its vegetation and destroy its value for agricultural purposes." It is also settled law in this state that title to islands that existed

within a navigable stream at the time Idaho was admitted to statehood do not pass to patentees of land by the sale of border lots by the United States. *Callahan v. Price, supra; A. B. Moss & Bro. v. Ramey, supra; Scott v. Lattig,* 227 U.S. 229, 33 S.Ct. 242, 57 L.Ed. 490 (1912) (Rev'g 17 Idaho 506, 107 P. 47 (1910)).

■ *"Islands"* in turn refer to bodies of land entirely and customarily surrounded by water; they do not include lands that are surrounded by a channel filled with water when the river is in flood stage, but dry during the remainder of the year. *Smith v. Long, supra; Younie v. Sheek, supra.*

Appellants assign error to the district court's demarcation of the natural or ordinary high water mark along the disputed portion of the Salmon River, arguing that the district court erred: by referring to the high land encircled by the secondary channel as an "island"; in finding that the eastern survey meander line of the Salmon River runs along the eastern bank of the secondary channel in close proximity of the line which respondents contend is the natural or ordinary high water mark of the river; in finding that the land between the meander line and the mainstream of the river was intended to be excluded from the lands conveyed by federal land patent; and in finding that the disputed lands were not suitable for agricultural purposes.

■ If competent and substantial evidence supports the district court's delineation of the natural or ordinary high water mark of the disputed portion of the river, appellants' related assignments of error must fail because the district court held that the northwestern boundary of appellants' property *coincided with the natural or ordinary high water mark established by the court.* In other words, regardless of where the meander line is located, what the intention of the federal government was in conveying appellants' three fractional lots

and whether the disputed land is an island or merely high land, the location of the natural or ordinary high water mark of the river is the central inquiry because that is the line that determines appellants' boundary line. Despite indications in its findings of fact that the district court was applying an exception to the general rule, the district court in effect applied the general rule that the natural or ordinary high water mark of a navigable river is the boundary line of abutting fractional lots. The district court quieted title, holding that appellants' property extended to the natural or ordinary high water mark. Findings of fact supported by competent and substantial, although conflicting, evidence will not be disturbed on appeal. I.R.C.P. 52(a); *Wisdom v. Henderson,* 98 Idaho 45, 557 P.2d 1118 (1976). Therefore, the central issue before this court is whether competent and substantial evidence supports the district court's determination of the natural or ordinary high water mark of the river.

Mr. William Scribner, Chief of the Bureau of Navigable Waters for the State of Idaho Department of Lands, investigated the disputed property for the purpose of determining the natural or ordinary high water mark of the Salmon River, which he defined as "the line which the water impresses on the soil so as to deprive it of vegetation and its value for agricultural use." Included in Mr. Scribner's duties as Chief of the Bureau of Navigable Waters are the functions of regulating beds and waters of navigable streams and determining boundary lines by visual inspection. Mr. Scribner indicated the natural or ordinary high water mark of the disputed portion of the river on Plaintiff's Exhibit No. 22 and Defendant's Exhibit No. 51. These exhibits indicate a natural or ordinary high water mark encircling the "island" area and another natural high water mark along the eastern edge of the secondary channel. Mr. Scribner testified on direct examination that this determination was based upon a visible line of escarpment caused by the

action of the water and upon an examination of vegetation in the area:

Q. How would you interpret or do you have an interpretation of this definition in order to enable you to apply it on the ground?

A. I attempt to . . . find if there are clear cut lines on the bank of the stream or lake. I examine vegetation to determine the general species, classification of the vegetation I find, the perennial vegetation such as grasses are particularly important. Certain shrubs, not all, are valuable in determining the boundary between the upland and the natural and ordinary high water mark.

Q. When you stated the definition of natural ordinary high water mark, I believe you mentioned agricultural purposes?

A. Yes.

Q. How does this relate to your interpretation of the definition?

A. My impression of agricultural purposes for the determination of this boundary is land which could be cultivated for crops or at least at the minimum used as hay ground or relatively high quality pasture land.

.     .     .     .     .

Q. Mr. Scribner, what made you decide to put the line where you have approximated it on that aerial photograph? [Plaintiff's Exhibit No. 22]

A. I started at the upstream end of the channel and picked up a line of relatively undisturbed area and followed that down . . . I started on the west side of the big island or the island area and attempted to walk the approximate boundary or where I thought in the very close proximity of where I would place the natural and ordinary high water mark. In doing this I casually identified the plant species that were growing. I looked at the river stones that were both above and below the line that I picked, the—generally speaking, the stones and gravel and rocks below the line I picked were void of any lichens or mosses which would indicate a flowing stream and generally speaking again the rocks above the line I picked had a deposition of lichen and mosses on them interspersed with the sand and finer material and perennial plants that I would consider to be of a terrestrial upland variety.

Mr. Scribner further testified that the land below the line he considered the *natural or ordinary high water mark* of the river contained large boulders, gravel and sand deposits and was not suitable for agricultural purposes. On cross examination Mr. Scribner again differentiated the vegetation above and below the area he considered as the natural or ordinary high water mark and defined the line of escarpment caused by the flow of the river:

Q. And let me ask you whether or not you notice in the picture any great difference between the vegetation above that line and below that line?

A. . . . There is a difference. The vegetation to the right [above] of that . . . line . . . becomes steadily more dense and below the . . . line or to the left of it the density of the vegetation steadily begins to thin.

Q. Now, it doesn't appear that there is any escarping topographical feature there; is that correct?

A. . . . There is a very definite escarpment etched in the sand but because of the very erosive nature of the sand it isn't long lasting. It's intermittent and interrupted.

Further, Mr. Scribner testified on cross examination that periodic inundation of land would not alter the location of the natural or ordinary high water mark of a river unless the inundation was severe enough to destroy the soil's value for agricultural purposes:

Q. Would the inundation of such land by water for up to thirty days destroy the use of the land for agricultural purposes?

A. Not necessarily. Merely flooding would not destroy it . . . again the water action itself, the type of inundation

has a considerable influence on the destruction of value for agriculture.

Q. Well explain that.

A. Wave action in quiet bodies of water will destroy the value of land for agricultural purposes. Current in and along and adjacent to rivers will do the same thing.

. . .

. . . . .

A. Generally speaking, the inundation of land by—that has a good stand of well established perennial plants for a short period of time wouldn't be harmed, but where the same land might be subjected to severe water action through the force of wind or through the current, then the soil could be deprived of its value for agriculture.

█ Based on this testimony, the district court reasonably could find that the line established by Mr. Scribner as the natural or ordinary high water mark of the river on Plaintiff's Exhibit No. 22 and Defendant's Exhibit No. 51 was "the line which the water impresses on the soil by covering it for sufficient periods to deprive the soil of its vegetation and destroy its value for agricultural purposes." I.C. § 58–104(9).

The court's holding is based upon the particular facts and circumstances presented *in this case.* Because of the soil's composition and extremely erosive action of the water along this portion of the Salmon River, land inundated for only a small portion of the year was held to be below the natural or ordinary high water mark of the river. Given different topographical features, soil composition or less erosive water action the result may have been otherwise. The issue on appeal, however, is whether the demarcation of the natural or ordinary high water mark of this portion of the river is supported by the evidence presented. The evidence introduced below indicated that inundation and water erosion had been severe enough *in this area* to deprive the soil of its vegetation and destroy its use for agricultural purposes. In an area where

water erosion is severe enough to move large submerged boulders, as was testified here, even periodic inundation may deprive the soil of its value for agricultural purposes. Based on a careful review of the testimony presented, the court holds that the judgment of the district court is supported by competent and substantial evidence.

█ Appellants, however, maintain that "agricultural purposes" includes the raising of livestock. Since the disputed land has been utilized by appellants as a heifer calving ground, appellants argue that land above the line established by the district court as the natural or ordinary high water mark is suitable for "agricultural purposes." Although this court has judicially construed agricultural pursuits in other contexts, "agricultural purposes" as used in I.C. § 58–104(9) previously has never been defined. The natural or ordinary high water mark of a river refers to a line impressed on the soil by the action of the water and contemplates a vegetation test as an aid in determining its location. In this context, whether the soil is valuable for agricultural purposes refers to the existence of vegetation and the soil's suitability for raising agricultural crops. Whether cattle could roam on the soil does not aid in determining the location of the natural or ordinary high water mark. Appellant's argument is therefore rejected and this portion of the district court's opinion is affirmed.

II.

█ Appellants next maintain that they have established title to the disputed property by adverse possession. However, in its memorandum opinion, the district court expressly stated that appellants did not allege title to the property on the theory of adverse possession. In fact, appellants objected at trial to testimony concerning adverse possession because they were not claiming title to the property by adverse possession. Issues not raised below will not be considered by this court on appeal, and the

parties will be held to the theory upon which the case was presented to the lower court. *Dunn v. Baugh*, 95 Idaho 236, 506 P.2d 463 (1973); *Willows v. City of Lewiston*, 93 Idaho 337, 461 P.2d 120 (1969); *Williams v. Havens*, 92 Idaho 439, 444 P.2d 132 (1968); *Frasier v. Carter*, 92 Idaho 79, 437 P.2d 32 (1968). This issue was not argued below and is therefore not before this court on appeal.

### III.

Finally, appellants assign error to that portion of the district court's judgment requiring appellants either to fence in their cattle to prevent their continued trespass below the natural or ordinary high water mark of the river established by the district court or to obtain a lease authorizing their occupancy of the land. Appellant also contends that by requiring appellants to fence their land would effectively deprive the appellant of the right to water its cattle. They further contend that either alternative entails undergoing a legal detriment not sanctioned by Idaho law.

Although the judgment of the district court did not require absolutely that appellants fence in their cattle, it did require that appellants alternatively obtain a lease of the property if they chose not to fence in their cattle. However, the trial court made no specific findings of fact or conclusions of law establishing whether the land in question was in a herd district or not and never indicated the basis for its judgment requiring the appellants to fence or to obtain a lease. Thus that portion of the judgment pertaining to this issue is unsupported by either findings of fact or conclusions of law. It is the conclusion of this court that this portion of the judgment must be and hereby is reversed.

Judgment affirmed in part and reversed in part. No costs allowed.

SHEPARD, C. J., and DONALDSON, BAKES and BISTLINE, JJ., concur.

APPENDIX

| | |
|---|---|
| ■■■■ | 12 ACRE PARCEL IN QUESTION |
| ▨▨▨ | APPELLANTS' PROPERTY |
| – – – | EASTERN SURVEYED MEANDER LINE |
| ·–·–·– | NATURAL AND ORDINARY HIGH WATER MARK FOUND BY THE DISTRICT COURT |
| ●–●–●–● | HIGH WATER MARK URGED BY THE APPELLANTS |

BISTLINE, Justice, specially concurring.

I am concurring in the opinion of the Court, but I am not convinced that the trial court properly determined the line of ordinary high water. Justice McFadden has been careful to point out that the holding of the Court here "is based upon the particular facts and circumstances presented *in this case.*" The rationale of the opinion today is that, from the testimony of Mr. Scribner,

the district court reasonably could find that the line established by Mr. Scribner "was the line of ordinary high water, and thus the judgment of the district court is supported by competent and substantial evidence."

As the Court's opinion ably points out, Mr. Scribner from a visual observation concluded where he thought the line of ordinary high water should be, and then applied his own theory of a vegetation test to substantiate it. In applying his theory, he did not seek to establish the point at which terrestrial vegetation ceased entirely because of inundation, but differentiated amongst the various species of terrestrial vegetation growing above and below his preconceived conclusion of the location of the line of ordinary high water. Counsel for Heckman's objected when Mr. Scribner was asked to identify an exhibit (plaintiff's No. 123) which was a listing of various species of vegetation which he "collected below the natural and ordinary high water-line." Counsel properly pointed out that the witness, Mr. Scribner, was *assuming* the location of the line of ordinary high water, and that location was precisely the issue which the trial court was called upon to resolve. The court did not sustain the objection, the court *assuming* that Mr. Scribner "will connect that up so his testimony here has some meaning  .  . .." Short minutes later, the objection was renewed, and again overruled. Shortly after that Mr. Scribner was asked for his opinion as to what plants grow below *his* line of ordinary high water, and the testimony was received *without objection.*

For the limited purpose of the statute involved, "natural or ordinary high water mark" is defined "to be the line which the water impresses on the soil by covering it for sufficient periods to deprive the soil of its vegetation and destroy its value for agricultural purposes." I.C. § 58–104(9).[1] Immediately after the definition there follows

in the statute this caveat: "Provided that this definition shall not be construed so as to affect or change the vested property rights of either the state of Idaho or of riparian or littoral property owners." *Id.* Mr. Scribner is employed by the Department of Lands and is chief of the Bureau of Navigable Waters. To him, according to his testimony, falls the task, in quiet title actions involving lands along Idaho's rivers, of making "the determination of the vegetation, where the water line is and where we think it is in relation to our ownership, the state's ownership."

In my view, the testimony was improper and should not have served as a valid predicate upon which to base a determination of the line of ordinary high water. But, it was received without objection, and the trial court cannot be said to be in error in considering it, in fact utilizing it as the basis of his decision.

Mr. Scribner testified that he started with that statutory definition of line of ordinary high water in his effort to establish the river-side boundary of the Heckman property. This definition was included as a part of the 1967 amendment, Idaho Sess. Laws ch. 236(9), to I.C. § 58–104, which declares the powers and duties of the State Land Board, and placed that Board in supervision of the use or disposition of land in the beds of navigable waters "to the natural or ordinary high water mark." *Id.*

While it is readily seen that Mr. Scribner's official position required him to ascertain the boundaries of the lake and riverbeds which I.C. § 58–104(9) placed under the supervisory jurisdiction of the State Land Board, Mr. Scribner should have felt obligated to respect the caveat of that section above set forth, and, rather than devise his own type-of-vegetation interpretation of that section, he should have given due regard to the source of the statutory definition. The record does not show that he was informed from whence that definition came.

---

1. The complete text of the sentence containing the definition reads: "The term 'natural or ordinary high water mark' *as herein used* shall be defined to be the line which the water im-

presses on the soil by covering it for sufficient periods to deprive the soil of its vegetation and destroy its value for agricultural purposes." I.C. § 58–104(9) (emphasis added).

The definition used by the legislature in 1964 did not originate with that body, but was adopted from this Court's definition, one by which the property rights of riparian or littoral owners have been both vested and determined for many years. The legislature quite obviously was knowledgeable of what the Court, over a quarter of a century ago, said in *Driesbach v. Lynch*, 71 Idaho 501, 506, 234 P.2d 446, 448 (1951), where the Court held that "[t]he natural or ordinary high water mark is that line which the water impresses on the soil by covering it for sufficient periods to deprive the soil of its vegetation and destroys its value for agricultural purposes."

In that case, the Court agreed that the evidence substantiated the trial court decision, "both with reference to the point of the natural or ordinary high water line and with reference to *the absence of vegetation* growing upon each parcel of land below the line found as the natural or ordinary high water line   .   .   .   ." *Id.* (emphasis added).

The legislature may not have realized, however, that the definition which it adopted had its origin even earlier than *Dreisbach*. Almost 60 years ago, in *Raide v. Dollar*, 34 Idaho 682, 203 P. 469 (1921), the Court first stated that same rule, adopting it from the Missouri Supreme Court's holding in *State ex rel. Citizens' Electric Lighting & Power Co. v. Longfellow*, 169 Mo. 109, 69 S.W. 374 (1902). Whether or not the legislature knew that the Court's rule dated back to 1921, the 1967 legislature had well in mind that the law in Idaho had been settled for many years; the caveat in the 1967 amendment clearly shows legislative recognition that property rights of riparian and littoral owners had become vested and should not become in any way unsettled by reason of placing the State Land Board in charge of lake and river beds. In other words, the 1967 amendment did not, nor did it purport to, make any change whatever in the existing law earlier declared in *Raide* and reaffirmed in *Driesbach*. Just the opposite is this case.

Such being so, Mr. Scribner, as Director of the Bureau of Navigable Waters, should have been directed to decision law rather than botany as his guide in his attempt to determine the extent of the domain which the State Land Board became empowered to administer as a result of the 1967 amendment. He chose, however, to apply the statutory definition by seeking out distinctions (which may have seemed reasonable to him) as to which types of vegetation might be classified as belonging below the line of ordinary high water, and which as belonging above that line. The legislature conferred no such power on the State Land Board, and in fact admonished to the contrary. For over 60 years it has been well-understood and accepted in Idaho that where the vegetation test is useable, in the absence of a clearly discernible water mark, it is the *absence* of any terrestrial vegetation which has been the determining factor.

Close attention is also directed to Mr. Scribner's testimony wherein, in addition to basing the accuracy of his placement of the line of ordinary high water, he emphasized that the land (which he considered below the line of ordinary high water) was unsuitable for agricultural purposes. Here again his conclusions were premised upon his own interpretation of the statute, and for land to qualify in his opinion as suitable for agricultural purposes, it would have to be capable of cultivation for crops, or, at a minimum, have utility as "hay ground or relatively high quality pasture land." For my part, I am unable to see that Mr. Scribner, or anyone on behalf of the state of Idaho, is in any way justified in impressing onto the statutory and court definitions that pasture land must be of "relatively high quality." Pasture land is pasture land, and it is nonetheless pasture land even though it be of a low quality, perhaps a very low quality. If it will pasture on animal, such is an agricultural purpose. And *a fortiori*, it will not pasture even one animal unless it sustains vegetation.

Concluding, I suggest also that the trial court decision in all likelihood is premised upon a faulty definition of the line of ordinary high water. In the Court's lead opinion, Justice McFadden observes that the trial court here held that "land inundated for only a small portion of the year was

. . . below the natural or ordinary high water mark of the river." That it was so inundated for a *small portion* of the year immediately gives concern that such river level is not, but is well above, the ordinary line of high water. The Salmon is not a little-known river, and the record here adequately shows that in the vicinity in question, it is a fast river. In the annual spring run-offs it is a torrential white-water river, as are many of the rivers in Idaho which are fed annually in the late spring and early summer when the winter snows rapidly melt into billions of gallons of water. Other rivers, such as the Snake and Portneuf in southeastern Idaho, and the Kootenai in Boundary County, rise dramatically, overflowing their banks, but these do not have the rapid descent as does the Salmon, and hence do not have the resultant force which the Salmon has in the area in question.

There is with all rivers a time of high water and a time of low water. The time of ordinary high water is the late spring or early summer, when the rivers are fed regularly by the melting snows at the upper elevations of the mountains. In time those snows are gone, and there comes the time of low waters. Almost at the same time new snows come on the mountains, but the seasons change, and the snow does not melt.

The *time of ordinary high water* is not to be confused with the annual spring flood waters, however. These are times when weather turns warm and much snow melts, and the rivers rise drastically, taking maybe 2 weeks to peak, and 2 weeks or so to recede. The receding returns the river to its line of ordinary high water.

With that in mind, it should be noted that here the evidence showed that in 2 years, 1966 and 1973, the *peak* flood waters did not even enter the secondary channel. In the last 15 years, the waters of the Salmon were in the secondary channel only an average of 31 days per year—otherwise put, the channel in those years was dry 11 months out of every 12. This is about the normal time that the rivers are in flood stage, and it is not easy to understand how the district court could find the secondary channel to be below the line of *ordinary* high water. Ap-

parently, and as I read the decision, it is attributable wholly to the sparsity of vegetation, and the types of vegetation as testified to by Mr. Scribner. As a matter of law, under those records, it would seem that the secondary channel is not a part of the bed of the Salmon River, but is a channel which has been cut and continued by the great annual spring runoffs, and it is clearly these great flood waters rushing downward which have moved boulders and carried away much loose soil.

The language of the Ninth Circuit Court of Appeals is a true statement of the law and apparently should be repeated here as a caution that this particular case affirmed today not be taken as establishing the law:

For the purposes of this appeal it is sufficient to state that appellants' theory is founded on the *mistaken assumption that the annual spring floods of the river (suffered prior to the advent of Hoover Dam), which covered the valley* from bluff to bluff, *constituted its "ordinary high water"* and that the valley, from bluff to bluff, *thus constituted the bed of the river.* By eliminating these floods, appellants contend, the Hoover Dam caused an avulsive change in the flow of the river so that the United States as riparian owner did not take title to the flood plain.

Appellants' definition of "ordinary high water mark" is unsound. The District Court concluded, and we agree:

"The ordinary high water mark of a river is a natural physical characteristic placed upon the lands by the action of the river. It is placed there, and the name implies, *from the ordinary flow of the river* and does not extend to the peak flow or flood stage so as to include overflow on the flood plain, nor is it confined to the lowest stages of the river flow."

This is in accord with holdings of the Supreme Court.

*United States v. Claridge,* 416 F.2d 933, 934 (1969) (citations omitted) (emphasis added).