James E. **DARST**, et al.,
Respondents/Cross–Appellants,

v.

The **METROPOLITAN ST. LOUIS SEWER DISTRICT**,
Appellant/Cross–Respondent,

v.

**ROCK HILL QUARRIES COMPANY**,
and **McCarthy Brothers Construction
Company**, Respondents.

Nos. 52714, 53043.

Missouri Court of Appeals,
Eastern District,
Division Three.

July 26, 1988.

Motion for Rehearing and/or Transfer
to Supreme Court Denied
Aug. 24, 1988.

Application to Transfer Denied
Oct. 18, 1988.

Donald J. Stohr, James W. Erwin, Thompson & Mitchell, St. Louis, for appellant/cross-respondent.

Raymond A. Bruntrager, St. Louis, for James E. Darst.

James C. Thoele, Brinker, Doyen & Kovacs, Clayton, for Rock Hill Quarries and McCarthy Brothers Const.

KELLY, Judge.

The Metropolitan St. Louis Sewer District ("MSD") appeals from the judgment of the trial court awarding $80,000.00 to respondents/cross-appellants James E. Darst and Anne V. Darst, homeowners in Ladue, Missouri, pursuant to the jury verdict in the Darsts' inverse condemnation action against MSD for damages caused by flash flooding of two creeks nearby their property. MSD also appeals the trial court's decision to sustain the motions for directed verdict of third party defendants/respondents Rock Hill Quarries Company ("Rock Hill") and McCarthy Brothers Construction Company ("McCarthy Brothers") and to dismiss MSD's claim for contribution and indemnity against the third party defendants based on the third party defendants' assertion that even if their actions had caused the flooding, the common enemy doctrine precluded any liability by them to the Darsts. The Darsts have cross-appealed against MSD raising the issue of their entitlement to pre-judgment interest and post-verdict interest assessments. The two appeals have been consolidated in the interest of judicial economy.

The following facts gave rise to the Darsts' inverse condemnation action against MSD. The Darsts' residence is located in a flood plain about two hundred yards west of the confluence of Two Mile Creek and Deer Creek. Their property is upstream from property owned by Rock Hill and McCarthy Brothers. A heavy rainfall on April 11, 1979, caused Two Mile Creek to overflow its banks. The Darsts' home, although protected by a berm completely surrounding it, was flooded when the creek's waters spilled over the berm at its lowest point where the Darsts' driveway crosses it. Reaching a height of about three feet above the floor of the Darsts' home, the waters damaged their house and much personal property. Within an hour, the floodwaters receded.

A year later, the Darsts filed their petition against MSD alleging that improvements made by MSD in Two Mile Creek caused the overflow and constituted a wrongful appropriation of the Darsts' land, in violation of Article I, Section 26 of the Revised Constitution of the State of Missouri which provides that private property shall not be taken or damaged for public use without just compensation. The Darsts sought $125,000.00 in damages.

MSD answered that its actions did not proximately cause the Darsts' damage. MSD also filed its third party petition against Rock Hill and McCarthy Brothers. MSD alleged that, in the event MSD were found liable to the Darsts, MSD was entitled to contribution or indemnity from Rock Hill and McCarthy Brothers because their conduct in filling in the flood plain on their land, located downstream from the Darsts, caused the damage to the Darsts' property.

The action was eventually tried on the Darsts' fourth amended petition. Pursuant to MSD's motions, the trial court dismissed two counts of the petition sounding in trespass. In the remaining count, the Darsts alleged that Deer Creek/Two Mile Creek had been altered by MSD and Rock Hill and/or McCarthy Brothers filled in the flood plain of Deer Creek east of the Darsts' property, "all of which acts caused a tremendous increase, both in volume and flow of the water in the creek adjacent to [the Darsts'] property and the banks of said creek [Two Mile Creek] and created a dangerous condition." Further, when the heavy rainfall occurred in April, the water

"was collected in the ditches below plaintiffs' [Darsts'] land as a result of the activities of the defendants [MSD, Rock Hill and McCarthy Brothers] ... in said ditches and the adjacent flood plain and was caused to overflow from its normal channel, flooding onto plaintiffs' [Darsts'] land," causing damage to the Darsts' property. The Darsts also alleged that none of the defendants had taken any "action to prevent such flooding, or had taken action which was not sufficient to provide adequate storm water drainage," despite their knowledge of the condition.

The evidence at trial showed that Rock Hill and McCarthy Brothers own property on Deer Creek, located about one mile downstream of the Darsts' property. Their property, like the Darsts, is located in a flood plain. Rock Hill owns a large quarry on the south side of Deer Creek. McCarthy Brothers owns the property on the north side of Deer Creek opposite the quarry.

MSD, in its plan approved by special election in 1954, was empowered with the jurisdiction, control, possession and supervision of sewer and drainage systems within its geographical bounds. In conjunction with this authority, Rock Hill Quarries for McCarthy Brothers applied to MSD for a permit in 1956 to construct a "Proposed Temporary Relocation of Deer Creek and Glendale Br[anch] in the property of Rock Hill Quarry." The application was accompanied by plans providing for three phases of construction designed to straighten a bend in the channel of Deer Creek. Phase one provided: "Owner [McCarthy Brothers] will relocate Glendale Branch and Deer Creek and construct banks as shown on plan. Owner will also fill east end of property to the extent as indicated on plan." Phase two stated: "Owner will straighten Deer Creek along [centerline] of proposed storm water easement with sections as shown dashed on 'Typical Cross Sections' and identified as 'temporary.'" Phase three provided that "[c]onstruction, by Metropolitan St. Louis Sewer District, of final paved sections within easement granted by Owner and shown on easement plat. These sections are shown on 'Typical Cross

Sections' and identified as 'Ultimate Design.'" The plans and application upon review by MSD were "approved for construction of Phase 1 and 2 only."

In April 1956, MSD issued its Permit No. 61 to McCarthy Brothers authorizing the construction. The eastern third of McCarthy Brothers' property was raised approximately seven feet by a fill they placed on their property. The filling operations did not block or obstruct the channel of Deer Creek. Deer Creek's channel was straightened and widened from fifty feet to one hundred feet from the top of the south bank to the top of the north bank. As completed under the permit, the channel of Deer Creek was sufficient to handle a ten-year designed storm water discharge. A stormwater facility designed for a ten year runoff means that the capacity of the channel is such that the stormwater will not go outside the banks of the channel during a rainstorm of that intensity and duration. MSD acquired an easement for the one hundred foot wide channel itself, but had no property interest in any part of the flood plain that was filled.

After inspection of the project, MSD gave its approval of the construction completed pursuant to Permit No. 61 of phases one and two on May 8, 1957. Phase three of the plans McCarthy Brothers (through Rock Hill) submitted to MSD in 1956 was never approved or constructed.

Shortly after approval of the construction, a severe storm in June 1957 occurred. During the 1957 storm, the levees gave way and the quarry property filled with water. The flood waters apparently came up on the Darsts' property but did not enter the house, then owned by the Darsts' predecessor in title.

Sometime after 1969, McCarthy Brothers filled in the rest of the flood plain north of Rock Hill Quarry for a distance about two thousand feet along Deer Creek and about five hundred feet back. MSD was unaware of the later flood plain filling done after 1969 by McCarthy Brothers. This later fill was west of the 1957 fill. On the eastern portion of the fill, McCarthy Broth-

ers built an office building. On the later western fill they built maintenance buildings and stored construction equipment.

The Darsts' expert witness Mr. Stifel Jens compared the flood occurring in 1957 with the 1979 flood and found the flood waters on the Darsts' property were higher in the 1979 flood although there was less rainfall in 1979 than in the 1957 flood. Mr. Jens attributed the increased flooding in 1979 to the raising of the flood plain downstream.

Mr. Jens explained that, prior to the filling of the flood plain by the McCarthy Brothers on their property, the waters of Deer Creek could overflow its banks onto the flood plain during time of heavy rains. After the flood plain was filled, the waters had no other place to go. Consequently, the flood waters backed up over the Deer Creek watershed onto the flood plain where the Darsts' property was located. He characterized the 1957 fill as "very minor" and as insufficient to have caused the 1979 flood. The "significant amount of fill" added later was largely responsible for the creek's rising to a flood level of 7.5 feet above the creek bank when it should have been only 5.76 feet normally resulting from a storm producing less than a ten year rainfall.

During cross-examination Mr. Jens acknowledged that everything occurring in the entire 4,300 acre watershed, as well as conditions farther downstream from the McCarthy Brothers' property, would affect the amount of the water flow. He also agreed that McCarthy Brothers' actions in raising the flood plain on their property was necessary for their intended use of their property. After the conclusion of all the evidence, the trial court submitted the Darsts' final count in inverse condemnation to the jury which returned its verdict in favor of the Darsts against MSD.

MSD raises ten points on appeal. It claims the trial court erred in entering judgment against MSD because the flooding of a private landowner's property constitutes neither a taking nor damaging for a public purpose by a public entity nor an invasion of a legally protectible interest when the damage to the landowners results from flooding caused by the acts of a private party and those acts are authorized under the common enemy doctrine. MSD's second point argues the trial court erroneously entered judgment against MSD where the evidence established that the flood waters damaging the Darsts' property were caused by the filling in of the flood plain by a private person upon private property for a private purpose, and not by any public work built, owned, operated or maintained by MSD. Its third point states the trial court erred in entering judgment against MSD on the theory that MSD failed to enforce its own charter or ordinance because MSD contends that, as a governmental agency, it owed no special duty to the Darsts as private individuals, separate from that owed to the public at large, to enforce its own charter or ordinance. In its fourth point, MSD states the trial court erred in entering judgment against MSD because the evidence clearly established that the eastern portion of the flood plain fill authorized by MSD in 1956 was not sufficient to cause the rise in height which the creek waters reached in the 1979 flood. MSD's fifth point claims the giving of a certain instruction was erroneous because the evidence failed to support the instruction in several respects. MSD's sixth point states that the statute of limitations barred the Darsts' action because their fourth amended petition filed more than five years after the flood had occurred raised a new claim alleging that the flood was caused by activities downstream, rather than upstream as alleged in their original petition. MSD further asserts the statute of limitations bars any claims for damages from a flood in 1979 when MSD had issued the permit for Rock Hill and McCarthy Brothers to fill the flood plain in 1956. MSD's eighth point contends the trial court erred in refusing to enter a partial satisfaction of the judgment by crediting against the jury award of damages the proceeds received by the Darsts from their flood insurance policy. MSD's ninth point complains the trial court erred in not awarding it a flowage easement over the Darsts' property upon payment of the judgment. MSD states

that the payment of the inverse condemnation judgment by it, the condemnor, entitles it to acquisition of the property or that portion deemed to have been taken or damaged. MSD's tenth and final point directed against Rock Hill and McCarthy Brothers states the trial court erred in directing a verdict in their favor against MSD because the common enemy doctrine as applied to downstream landowners should be modified. MSD requests this court transfer the appeal to the supreme court to clarify whether the common enemy doctrine should be modified to require downstream landowners to act reasonably in diverting flood waters from their property onto others' property.

MSD has vigorously argued each of the issues it has raised. Notwithstanding its able presentation of its claims, we believe a single issue is dispositive of this appeal. That issue, as framed by MSD, is whether MSD, a governmental agency, can be held liable under a theory of inverse condemnation for flooding the property of an upstream landowner (the Darsts) caused by the actions of Rock Hill and McCarthy Brothers, private downstream landowners, in filling a flood plain on their property.

MSD's position in a nutshell is three-fold. First, MSD is not liable under a theory of inverse condemnation for a taking or damaging of the Darsts' property because McCarthy Brothers and Rock Hill as downstream landowners had a right under the common enemy doctrine to fill in the flood plain on their property to protect it and MSD is blameless either for allowing or failing to prevent the actions of McCarthy Brothers or Rock Hill. Second, MSD is not liable under a theory of inverse condemnation because the damage to the Darsts' property was occasioned not by a public work for a public use but by an enterprise totally private in character, that is, private ownership, construction, purpose and property. Third, MSD's issuance of the permit authorizing McCarthy Brothers and Rock Hill, private individuals, to construct a fill which was insufficient to raise the flood waters to the flood level actually reached which result in damage to another private landowner's property is not a taking or damage by a public entity within the meaning of the Missouri Constitution.

The Darsts respond that MSD's focus on the rights of a downstream landowner to protect itself against surface water under the common enemy doctrine is short-sighted. The Darsts highlight evidence not only of the filling in on McCarthy Brothers' and Rock Hill's property but also of alterations to the creekbed and building up of the creek banks. The Darsts view the foregoing evidence as proof that the natural watercourse was changed. The Darsts argue, as submitted in their verdict director, that MSD "constricted or allowed the constriction of the natural flow of flood waters from Two Mile Creek and Deer Creek so as to flow on to Plaintiffs' [Darsts'] property."

The Darsts postulate that a "natural watercourse" encompasses not only the creekbed, but also the flood plains abutting the creekbed. Under this theory, the Darsts argue that constriction of the natural watercourse occurs upon the elimination of the flood plain. Citing *Happy v. Kenton*, 247 S.W.2d 698, 700 (Mo.1952), for the proposition that Missouri law is clear that anyone who obstructs a natural watercourse is liable for ensuing damages to others, and noting that Deer Creek is a natural watercourse, the Darsts conclude they are entitled to the unobstructed flow of the natural watercourse and the common enemy doctrine is inapplicable.

Although the Darsts' expert witness did not define "natural watercourse", our Missouri Supreme Court has. In *Sigler v. Inter–River Drainage District*, 311 Mo. 175, 279 S.W. 50, 57 (1925), our supreme court echoed *Munkres v. K.C., St. Joseph & Council Bluffs R.R.*, 72 Mo. 514, 516 (1880) which stated that "[a] natural watercourse is a stream or brook having a definite channel for the conveyance of water ... The water must usually run in a definite bed or channel, though it need not flow continually the year round." Flood water of a stream which entirely escapes from the bed of a stream is surface water and

may be treated as such by everyone. *Sigler*, 279 S.W. at 57.

In connection with the disposition of surface water, Missouri has adhered to the common law rule more accurately described as the common enemy doctrine. In setting out the common enemy doctrine in *Goll v. Chicago & A. Ry. Co.*, 271 Mo. 655, 197 S.W. 244, 246–47 (1917), our supreme court quoted the following from Angell on Water Courses (7th Ed.) § 108 a:

> A coterminous proprietor may change the situation or surface of his land, by raising or filling it to a higher grade, by the construction of dikes, the erection of structures, or by other improvements which cause water to accumulate from natural causes on adjacent land and prevent it from passing off over the surface.

The forgoing precludes our acceptance of the Darsts' view that the common enemy doctrine does not apply to natural watercourses.

■ We are more troubled that the Darsts equate their entitlement to the "unobstructed flow of the natural watercourse" with their position that MSD constricted the "natural flow of floodwaters from Two Mile Creek and Deer Creek." As noted in *M.H. Siegfried Real Estate v. City of Independence*, 649 S.W.2d 893, 896 n. 3 (Mo. banc 1983), Missouri courts have consistently distinguished between the obstruction of a natural watercourse and the impeding of the flow of surface water. The evidence here showed that Deer Creek, with its elevated banks, holds more than it did previously. Furthermore, Deer Creek was widened from fifty to one hundred feet and deepened from thirteen to twenty feet. Nothing in this evidence established that MSD's actions actually obstructed the natural watercourse.

The elimination of the flood plain by the actions of McCarthy Brothers and Rock Hill in building up their property denied the floodwaters a spillover area from the creekbed. Thus, while a constriction of waterflow existed, the constriction was not an obstruction in the channel. Consequently, the flood waters caused the back-up

along Deer Creek and, eventually, the upstream flooding of the Darsts' property.

In *Haferkamp v. City of Rock Hill*, 316 S.W.2d 620 (Mo.1958), plaintiffs sought damages to their property under a theory of inverse condemnation on the basis that defendants, subdivision developers and a city, increased the volume and rate of flow of surface water flowing in a natural drainway and onto plaintiffs' property exceeding the levels it reached prior to the construction of the subdivision. The city was alleged to have acquired and maintained a catch basin and storm sewer from the private developer. These facilities collected surface water and discharged it into a natural drainway leading to a sinkhole on plaintiffs' property. The court determined the evidence was insufficient to establish that the city and the private developers were engaged in a joint enterprise to predicate liability upon the city for the actions of the private developer, despite the city's involvement because the city engineer had approved the storm sewer plans and supervised their construction. *Id.* at 629. The court further observed, however, that the city's liability would be determined on the same basis as that of the developers if the streets and storm sewers were turned over to and accepted by the city. *Id.* Thus, if the developers' acts in disposing of the surface water were within the bounds of the common enemy doctrine (as modified by the *Haferkamp* court), then no liability inured to the city. "If defendants' [the developers] acts were within the permitted limits, there could be no taking or damaging of plaintiffs' property within the meaning of Article I, § 26 of the Missouri Constitution." *Id.* at 630.

The Darsts do not dispute that Rock Hill and McCarthy Brothers had a right to fill in their property in order to build on it. Their actions in filling on their land did not interfere with the natural watercourse; Deer Creek continued to flow unimpeded in its own channel. The evidence established the creekbed was, in fact, deeper and wider. The injury of which the Darsts complain is that the fill acted as an obstruction to vagrant flood waters. In *M.H. Siegfried Real Estate*, our Missouri Supreme

Court held that the bare obstruction of the flow of surface water by a lower owner is no occasion for liability, although the effect on the upper owner would be highly predictable. 649 S.W.2d at 896–97.

The trial court here granted the identical motions for directed verdict separately filed by Rock Hill and McCarthy Brothers which averred that their actions in filling in any part of the flood plain on their property was permissible under the common enemy doctrine. To conclude that the common enemy doctrine shields Rock Hill and McCarthy Brothers from liability for their actions in filling in the flood plain on their property, but to hold MSD liable for those acts authorized to Rock Hill and McCarthy Brothers contravenes the principle of liability espoused in *Haferkamp.* Under the direction of *Haferkamp,* we conclude that where McCarthy Brothers and Rock Hill were permitted to construct the fills on their own property, MSD cannot be held to have taken or damaged the Darsts' property within the meaning of Article I, § 26 of the Missouri Constitution.

■ Even were we to accept the Darsts' characterization that their action was based on MSD's constriction of the natural watercourse rather than Rock Hill's and McCarthy Brothers' diversion of surface water under the common enemy doctrine, we believe the Darsts' inverse condemnation action against MSD must fail. In *Max v. Barnard–Bolckow Drainage District,* 326 Mo. 723, 32 S.W.2d 583 (1930), plaintiff brought an action for damages against a drainage district for interfering with the flow of a river which operated plaintiff's gristmill. Plaintiff's predecessor in title had been granted a permit to erect a dam across the river some eighty years earlier. As part of a reclamation plan, the district straightened the channel of the river by cutting off the bends in the river by excavating certain ditches. *Id.* at 584. The water of the stream was always restored to the original channel. The ditches were enlarged and widened by erosion and "dirt, earth and debris washed out of the ditches" and was carried down the river into plaintiff's millpond and forebay and into the river below the dam. As a result, the millpond and forebay became filled with the earth and debris, so that the water in the millpond, forebay and river below the dam was reduced and diminished, rendering plaintiff's water mill useless. *Id.* at 583. Plaintiff maintained that the state "could not, by its own subsequent acts, reduce the natural flow and depth of the water in the stream so as to impair the water power used to operate his mill without compensation by the state to him therefor." *Id.* at 585.

The court determined that the state's grant of the permit was not irrevocable and did not warrant that "for all future time no part of the stream should ever be used by the state for a public purpose without compensating the owner of the dam if the flow of the water was thereby impaired." *Id.* The court held that no legal right had been invaded, violated, or infringed and the damages being without legal injury were within the classification of damnum absque injuria. *Id.* at 586[6].

The court added the following observations:

In the construction of said drainage ditches, the respondent [drainage district] did not encroach upon the lands or property of the appellant, and there was no actual or physical taking or damaging of plaintiff's property, or enforced occupation thereof or interference therewith, or the exercise of any proprietary functions in relation thereto. Subsequent to the completion of the ditches, mud, earth, and debris which washed out of the ditches, was carried downstream and deposited in appellant's millpond, formed by the dam, and in the forebay and river below the dam. The damage alleged by appellant is plainly not the natural consequence of the construction of said ditches and such as could and ought to have been anticipated and expected as a result, and it readily appears that the damage resulting is indirect, incidental and consequential.

Acts of a governmental agency in the proper exercise of the police power of the state which do not directly encroach upon

private property or private rights, though their consequence may impair the use or enjoyment thereof, are held not to be a taking or damaging within the meaning of constitutional provisions relating to eminent domain and do not entitle the owner of such property to compensation from the state or its agent for such incidental or consequential damage. *Id.*

Thus, in *Max v. Barnard–Bolckow Drainage District*, our Missouri Supreme Court held that "dirt, earth and debris" which washed out from drainage ditches and carried down the river into plaintiff's millpond and forebay, filling them, and caused the diminution of water in the millpond, forebay and river below the dam, results in only indirect, incidental, and consequential damage. Under the guidance of *Max v. Barnard–Bolckow District*, and cases cited therein, including *Anderson v. Drainage & Levee District*, 309 Mo. 189, 274 S.W. 448 (1925), and *Indian Creek Drainage District et al. v. Garrott*, 123 Miss. 301, 85 So. 312, 319 (1920), if we accept Darsts' argument that MSD was responsible for construction which altered the creekbed and raised embankments, MSD's actions are cloaked with the mantle of public use. MSD's action in issuing a permit authorizing the embankments and creekbed changes was a proper exercise of the police power to straighten the bend in Deer Creek. Further, the changes to the watercourse caused no diversion of the original creek from its bed, *i.e.* the water of the creek was always restored to the channel which had been widened and deepened. We find the actions of MSD did not directly encroach upon the Darsts' private property and that there was no actual and physical taking or damaging of their property attributable to the actions of MSD. The damage the Darsts alleged the flooding caused are plainly not the natural consequence of the changes in the creekbed and raised embankments authorized by MSD in its permit to Rock Hill and McCarthy Brothers. As in *Max v. Barnard–Bolckow Drainage District*, the damage resulting, if any, is "indirect, incidental and consequential," and does not entitle the

Darsts to compensation against MSD under a theory of inverse condemnation. Our disposition of MSD's appeal renders unnecessary any discussion of the Darsts' cross-appeal.

Judgment reversed.

SATZ, P.J., and SMITH, J., concur.