The judgment for the criminal convictions is affirmed. Rule 30.25(b).

The judgment for denial of post-conviction relief is affirmed. Rule 84.16(b).

STATE of Missouri, Respondent,

v.

Cleophus PARKER, Appellant.

No. WD 40177.

Missouri Court of Appeals,
Western District.

Dec. 5, 1989.

Motion for Rehearing and/or Transfer to Supreme Court Denied Jan. 2, 1990.

John A. Klosterman, Columbia, for appellant.

William L. Webster, Atty. Gen., John P. Pollard, Asst. Atty. Gen., Jefferson City, for respondent.

Before MANFORD, P.J., and SHANGLER and CLARK, JJ.

## ORDER

PER CURIAM:

This is a consolidated appeal involving a direct appeal from a jury conviction for kidnapping, in violation of § 565.110, RSMo 1986; second degree robbery, in violation of § 569.030, RSMo 1986; three counts of forcible rape, in violation of § 566.030, RSMo 1986, and two counts of forcible sodomy, in violation of § 566.060, RSMo 1986, and the denial of post-conviction relief sought pursuant to Rule 29.15.

James Louis SCHULZE and Betty Ann Schulze, Plaintiffs-Appellants,

v.

MONSANTO COMPANY,
Defendant-Respondent.

No. 55195.

Missouri Court of Appeals,
Eastern District,
Division Four.

Dec. 12, 1989.

John M. McIlroy, John M. McIlroy Jr., Bowling Green, for plaintiffs-appellants.

Albert A. Michenfelder, Steven W. Koslovski, Clayton, for defendant-respondent.

STEPHAN, Judge.

James Louis Schulze and Betty Ann Schulze, husband and wife, appeal from the judgment entered in favor of respondent Monsanto Company after a bench-tried case. Both appellants and Monsanto are riparian landowners of property on opposite sides of the Cuivre River in Lincoln County, Missouri. Appellants sought damages and injunctive relief against Monsanto for its alleged obstruction and diversion of the natural flow of the Cuivre River with increased surface water on their farm resulting in erosion and loss of crops. The trial court determined that Monsanto's actions were legally protected under Missouri's modified common enemy doctrine and provided no basis for any liability under any theory submitted by appellants. We affirm the judgment of the trial court.

The central issue raised by appellants for our consideration is whether the evidence presented to the trial court was sufficient to support its findings. For this purpose, all evidence favorable to this result is accepted as true with all reasonable inferences to be drawn from it and all contradictory evidence is disregarded. *Thomas v. Estate of Ducat,* 769 S.W.2d 819, 821 (Mo.App. 1989).

Appellants own a 396 acre farm in Lincoln County, Missouri, east of Troy, with its western boundary along the eastern bank of the Cuivre River. Monsanto's 576 acre farm lies directly across the Cuivre River from appellants' farm. Both farms were originally part of a larger farm owned by James Schulze's grandfather. Monsanto bought its farm in 1978 from James Schulze's brothers Raymond and John and a small portion from him.

Prior to 1978, Raymond had constructed berms across his property to alleviate the problems caused by the recurrent flooding of the Cuivre River. Severe floods had occurred in 1941, 1969 and 1974, with smaller floods occurring annually. James Schulze, whose farm's elevation is, at points, seven to eight feet lower in elevation than Monsanto's farm, also had built a series of levees to curb the effects of the flooding. Despite these efforts, the annual flooding of the Cuivre River caused property damage, including erosion, scouring, holes, sand deposits, and crop loss to the low-lying bottom lands.

Shortly after Monsanto's purchase of its farm, another major flood occurred in 1979. In response, Monsanto raised the height of the existing levees about two feet and extended them until the levee system completely enclosed its farm. The effect of the levee caused the water level to rise one-half to two feet, as compared to no levee, and

increased the water velocity during flooding by one-half foot per second. In addition to the levee improvements, Monsanto installed approximately 900 to 1,000 feet of blanket rock riprap along a portion of its bank in early 1982. This was done to control the erosion along Monsanto's river bank cut away by the Cuivre River's meandering within its banks. In 1985, Monsanto installed nine "hard points" along its river bank. The hard points were areas of rock riprap located at measured intervals along the river bank. Like the riprap, the hard points were designed to prevent erosion by the Cuivre River which was undermining the banks supporting Monsanto's levee system. Monsanto's plans for the future included twenty-four more hard points. Construction of these additional improvements was not undertaken because appellants initiated this lawsuit against Monsanto claiming that Monsanto's construction of the enclosed levee and installation of the riprap and hard points along the Cuivre River resulted in the obstruction and diversion of the natural flow of the watercourse, causing it to overflow onto appellants' property with damage to their soil and crops.

Appellants raise three issues: one, whether Missouri's common enemy doctrine shielded Monsanto from liability; two, whether the weight of the evidence established a causal relationship between Monsanto's obstruction and diversion of the watercourse and the property damage appellants sustained; and three, whether Monsanto's actions were negligent and reckless in planning and constructing the erosion and flood control devices on the Cuivre River precluding its reliance on the modified common enemy doctrine.

In appellants' first point, they claim the trial court erred in its conclusion of law that the actions taken by Monsanto to prevent the erosion and flooding of its property by river water are legally protected and provide no basis for liability under the common enemy doctrine. As recently recognized by our supreme court in *Looney v. Hindman*, 649 S.W.2d 207, 210 (Mo. banc 1983), Missouri adheres to the modified common enemy rule. One of the clearest

declarations of this rule is found in *Happy v. Kenton*, 362 Mo. 1156, 247 S.W.2d 698 (1952). Our supreme court stated:

... Missouri is committed to the doctrine that one may not obstruct a natural watercourse without liability for ensuing damages to others, but that one may otherwise treat surface waters as a common enemy and obstruct their flow without liability for ensuing damages so long as he does so reasonably and not recklessly or negligently.

247 S.W.2d at 700. Our courts have further held that one is entitled to dam against surface water to ward it off one's own property even if in so doing, one casts the water back upon a neighbor. *Thomas v. Estate of Ducat*, 769 S.W.2d 819; *Kirkham v. Wright*, 760 S.W.2d 474, 484 (Mo. App.1988). Appellants have no dispute with these basic tenets but argue that the modified common enemy doctrine applies only to surface waters and not to a natural watercourse. They conclude the actions taken by Monsanto in building its levee and installing riprap and hard points constitute an obstruction and diversion of the natural watercourse of the Cuivre River.

For ease in discussion, we first address whether the levee system obstructed the Cuivre River and then whether the riprap and hard points obstructed or diverted a natural watercourse.

The precise question before us is what liability does a riparian landowner incur for building a levee along a natural watercourse thus confining the flood channel so that during high water the overflow is forced over another's land. We are guided by the early case, *Anderson v. Inter–River Drainage and Levee District*, 309 Mo. 189, 274 S.W. 448 (1925). In *Anderson* plaintiffs owned lands along the east bank of the St. Francis River. As a result of defendant's levee which extended about twenty-five miles along the west bank of the stream and opposite to plaintiffs' land, overflow waters during flood stage were cast upon plaintiffs' lands in unnatural quantities.

In *Anderson*, plaintiffs' petition described the St. Francis River as a winding

stream having banks and flowing "through a low, flat and practically level country." 274 S.W.2d at 451. Plaintiffs had alleged that defendant's levee was constructed "along and on the west bank of the St. Francis River"; that the land constituting the west bank of the river was lower than the east bank; that the lands upon which the levee was built were frequently under water before the levee was built and during a portion of the year formed a part of the bed of the river and that the waters of the river escaped and passed down the river at frequent intervals and at various seasons of the year over the lands (on which the levee was later built) enabling the waters to escape and pass off and down the river without obstruction and more rapidly. *Id.* They further claimed the levee construction constituted an obstruction of the river and diverted the waters of the river from the west side out of their natural water channel; that it narrowed the channel and caused the waters of the river to pile up and flow over the east bank; and that it entirely closed, cut off, and obstructed the flood channel of the river on its west side. *Id.*

The defendants invoked, as respondents did here, the rule of surface and overflow water. Plaintiffs responded that under their petition, no basis for that rule existed. *Id.* They argued that their averment "the levee was constructed along and on the west bank of the river" did not mean that the levee was not constructed in the channel of the river. *Id.* In sum, they claimed "along and on" the channel properly meant in the channel, as well as outside the channel. *Id.* From this position, they asserted that the levee had obstructed and narrowed the St. Francis River, so the surface water doctrine was inapplicable. *Id.*

Our Missouri Supreme Court, after quoting the definition of fresh water river and the accompanying discussion of such river's natural channel contained in *State ex rel. Citizens' Electric Lighting & Power Co. v. Longfellow*, 169 Mo. 109, 121, 69 S.W. 374, 377 (1902), determined that the allegation of a winding stream flowing through a low, flat and practically level area, does not reasonably imply the existence of a high water channel or flood channel. *Anderson*, 274 S.W. at 451. The court stated that a levee on the west bank of a river cannot be held to be in the channel. *Id.* The gist of the court's holding implied that the surface or flood water rule applied to an obstruction along the river, such as the levee, absent its actual interference in the river channel. *Id.* at 453–55.

*Anderson* was cited with approval in *City of Hardin v. Norborne Land Drainage District*, 360 Mo. 1112, 232 S.W.2d 921, 926 (1950). Finally, in our recent case of *Darst v. Metropolitan St. Louis Sewer District*, 757 S.W.2d 270 (Mo.App.1988), we followed the course set in *Anderson*. In *Darst*, the property owners had filled in their land located in the flood plain of a creek. We determined that such measures taken by the landowners which caused the back up of the creek's flood waters onto the property of a neighbor were not violative of the modified common enemy doctrine. 757 S.W.2d at 275. We also determined that the landowners' actions in filling in their property did not interfere with the natural watercourse because the creek "continued to flow unimpeded in its own channel." *Id.*

We see no reason to deviate from the direction taken in these cases. Although portions of Monsanto's levee system run very close to the Cuivre River, nowhere does its levee touch the Cuivre River in its normal flow. Appellants' own expert acknowledged the levees do not come into play until floodstage, after the Cuivre River has overflowed its banks. We find no disagreement with the trial court's conclusion that the action of Monsanto "in improving and extending the levees found on its property did not obstruct or divert the natural watercourse for before the levees take effect the water must be out of its banks and this is the purpose of the 'modified common enemy doctrine' which is applicable herein".

■ Just as we are satisfied with the trial court's decision concerning the Monsanto levee system, we are equally satis-

fied with the trial court's determination that Monsanto's hard points and riprap did not obstruct or divert a natural watercourse.

Appellants contend that Monsanto's installation of the nine hard points and thousand feet of riprap along Monsanto's riverbank constitutes an obstruction or diversion of the natural watercourse of the Cuivre River. Appellants highlight evidence that Monsanto's hard points and riprap caused increased turbulence along the Cuivre River proximately causing the damage inflicted upon appellants' property. Appellants state the only pertinent issue is whether the obstruction or diversion, of whatever size or nature, causes harm to another.

Appellants' argument, carried to its extreme, would prevent a riparian owner from making any improvements in the river bed or along its river banks which would in any way, however minimal, obstruct or divert the natural flow of the watercourse. Appellants themselves grant that Monsanto's installation of riprap and hard points has not unleashed a daily deluge onto appellants' property. Nevertheless, appellants would have us hold Monsanto liable for trespass because of its actions along its own shoreline to control the erosion and flooding of its property. Appellants contend liability in such cases approximates absolute liability once a causal connection is established between Monsanto's actions and appellants' injury.

Appellants emphasize testimony that Monsanto installed the riprap and hard points to prevent erosion from "river action". Monsanto's farm manager testified that the hard points and riprap were installed to "deflect the stream of water". It is undisputed that the riprap and hard points caused some small amount of turbulence around their immediate vicinity. The trial court expressly found that the riprap and hard points "cause an increase in turbulence and thus an increase in the bouncing off of the riverbank as it naturally does with some residual increase in erosion, and again the amount is unknown". The evidence also showed such turbulence dissi-

pated with the momentum of the water flowing downstream in the Cuivre River. We have carefully scrutinized the exhibits, photographs and transcript furnished us, including testimony that the hard points were established one foot away from the mean high water line on the riverbank. The record clearly establishes the minimal extent to which Monsanto's riprap actually protruded into the channel of the Cuivre River. We are aware that the rock went down to the waterline and at the waterline, a three foot trench was excavated and filled with sand and stone. Monsanto's farm manager also testified that the rock was placed flush with the bank and did not project past the riverbank. He acknowledged the riprap and hard points were designed as devices to control erosion of Monsanto's property. However, at no time did the riprap or hard points act to impound and thus release water onto appellants' property.

Missouri has previously upheld the right of landowners to protect against erosion. For example, in *Tackett v. Linnenbrink*, 112 S.W.2d 160 (Mo.App.1938), a property owner attempted to prevent the further erosion of his field by a gully that was getting deeper and wider. The Western District observed:

Often a gully or draw will begin to cut in an adjacent field and by erosion will cut deeper and deeper and extend itself farther and farther, and if not checked will gradually cut its way back through a field adjoining above. Under such conditions, we conclude that the owner of land lying above has a right to protect his field from the disasters of having his field so cut and divided by the encroaching gully or draw.

*Id.* at 164. *Tackett* involved obstruction of a gully, not a natural watercourse and, therefore, is not conclusive in resolving the issue before us. Nevertheless, we find its rationale persuasive.

With respect to the use of the riprap and the construction of the hard points, we agree, as appellants have argued, that the present case is not squarely within the traditional application of the common ene-

my doctrine. Nevertheless, it presents a substantially similar situation. Monsanto's actions along its riverbank were purely defensive efforts to combat the encroachment and erosion by the meandering of the Cuivre River. Both appellants and Monsanto had the means to protect themselves from the destructive effects of the river and the position advanced by appellants would have the effect of imposing on Monsanto the burden either of suffering the destruction of its farm or paying for measures to protect both owners from the erosive forces of the stream.

We believe that a riparian owner such as Monsanto whose land is being washed away, undercutting its lateral support, faces a situation much like that of an owner threatened by surface or flood waters. In all three situations, the owner must act to protect the land or suffer its virtual or actual loss or at least the loss of its beneficial use. All three situations are closely analogous to that of a coastal owner who can only protect himself against marine erosion by erecting groins which may in turn direct the sea's erosive force to neighboring land. We have no difficulty, given our review of the evidence, in concluding that Monsanto's control of its riverbank erosion and farmland flooding does not constitute an obstruction or diversion of the natural watercourse to render Monsanto liable to appellants under their trespass theory.

■ Appellants' second point contends the trial court's judgment is against the weight of the evidence which established a causal relationship between Monsanto's actions allegedly obstructing and diverting the waters flowing in a natural watercourse, the Cuivre River. Appellants focus on the following finding by the trial court in its judgment:

> [U]nder the 'modified common enemy doctrine', the actions of defendant Monsanto in extending and enclosing the existing levee system on its land, as well as in combating the erosion along the river bank through rip-rap and hard-points, are legally protected and give no basis for liability under any theory submitted by plaintiffs.

Appellants believe the trial court's finding to be erroneous for two reasons. First, they challenge the conclusion that the modified common enemy doctrine absolves Monsanto from liability. Second, they challenge the court's conclusion that Monsanto's actions in improving and extending its levees and also in installing the hard points and riprap "did not have the effect of obstructing or diverting the natural watercourse".

Appellants highlight certain portions of the record, particularly the trial testimony of Dr. Charles D. Morris, their expert witness. They argue that the substantial weight of the evidence established that the construction of rock hard point revetments and rock blanket riprap, together with those portions of Monsanto's leveee system without adequate set-back obstructed and diverted the natural flow of the Cuivre River. They dismiss Monsanto's response that appellants' farm historically has been subject to severe flooding as irrelevant and as no excuse for the present day flooding and erosion they attribute directly to Monsanto's installation of its river and flood control devices.

In regard to the levee, the trial court expressly found that the natural watercourse has already exceeded its natural capacity before the levee takes effect. We need not reiterate our discussion within appellants' first point. As previously mentioned, we conclude the common enemy doctrine clearly applies to the levee Monsanto constructed to prevent flooding on its property. Substantial evidence supports the trial court's finding that the levee did not obstruct or divert the natural watercourse, but, instead, acted only to repel the river's waters after they had overflowed the banks and were flooding Monsanto's farm.

In regard to the riprap and hard points, the trial court decided that, at the most, they "cause an increase in turbulence and thus an increase in the bouncing off of the river bank as it *naturally* does with some residual increase in erosion, and again the

amount is unknown." (Emphasis added). The court further concluded that most of the damages claimed by appellants were "caused by earlier flooding and high water; that the area covered with sand and rock, the loss of organic nutrients, loss of livestock, damage to plaintiffs' [appellants'] own levee and erosion has happened, and will continue to happen, as a result of flooding, irrespective of defendant's levee system, rip-rap and hardpoints."

Appellants' hydrologist Dr. Morris testified that the erosion from the natural effects of the river was on Monsanto's bank, due to its natural curve, and that the erosion on appellants' bank was due to the installation of the hard points and riprap by Monsanto. He was unable to quantify this erosion. Monsanto's expert, a consulting engineer specializing in flood control, testified that neither the hard points nor the riprap along the riverbank caused the erosion on appellants' property. He added the momentum of the water in the channel as it moved naturally downstream dissipated any turbulence these rock revetments had created.

His testimony, presumably accepted *in toto* by the trial court, is substantial evidence to support the trial court's conclusions of law. We defer to the superior position of the trial court judge as the ultimate finder of fact. Even accepting that the retardance created by a dirt bank is less than that for a riprapped bank, the court had substantial evidence that the hard points and riprap did not constitute obstructions or diversions within the natural watercourse. In all three cases cited by appellants, the obstructions or diversions involved a far greater degree of intrusiveness by the offending party than the marginal effect of the hard points and riprap demonstrated here. Appellants' second point is denied.

■ Appellants' third and final point states that "Monsanto was not entitled to invoke the 'modified common enemy doctrine' because it acted negligently and recklessly in both the planning and construction of its river control devices." The crux of appellants' argument is that Monsanto failed to use reasonable care in the selection of engineers to plan, design and construct its river and flood water control devices. Appellants fault Monsanto for its failure to perform velocity studies or computer modeling of the river flow. They attack Monsanto's failure to hire any hydraulic engineers or hydrologists and denigrate its decision to rely, instead, only on the advice of its civil and mechanical engineers, electrical engineers and draftsmen. They further state Monsanto presented no credible testimony at trial on the reasonableness of its decision not to employ or consult with experts in the field of hydrology or its failure to conduct any studies on the impact of its erosion and flood controls upon the Cuivre River and Monsanto's neighboring landowners. Appellants conclude such evidence demonstrated Monsanto's negligence and recklessness which proximately resulted in the obstruction and diversion of increased and harmful amounts of surface water onto appellants' property.

Appellants quote 93 C.J.S. "Waters" § 20(b) (1956) which states that "[i]n the construction of bridges, culverts, embankments, or other works engineers of at least ordinary knowledge and skill should be employed, although liability will be imposed for any lack of skill or improper judgment in the particular case, no matter what their general skill or competency may have been." If the thrust of appellants' position is that Monsanto was negligent because it did not employ hydraulic engineers, it is clear that the trial court found to the contrary. Monsanto's reliance upon its own civil and mechanical engineers and draftsmen rather than hydraulic engineers does not mean that Monsanto's actions in fending flood waters off its property were not within reasonable limits. While these men admittedly were not hydrologists, appellants did not sustain their burden to establish Monsanto's engineers demonstrated lack of skill or improper judgment in this particular case. The remainder of appellants' argument misconstrues the import of the "reasonable limits" restriction on the otherwise expansive scope of the common enemy doctrine. In its purest application,

the doctrine has no limitation. Most Missouri cases, however, recognize that the right to ward off or block surface water must be exercised "within reasonable limits and not recklessly." *Wells v. State Highway Commission*, 503 S.W.2d 689, 692 (Mo.1973); *see also Clark v. City of Springfield*, 241 S.W.2d 100, 105 (Mo.App. 1951), and cases cited therein.

The primary situation which has been found violative of the "within reasonable limits and not recklessly" restriction on a landowner's rights in dealing with surface or flood waters is familiarly known in Missouri as a prohibition against "collecting and discharging" such waters. This general rule was clearly articulated in *Blydenburgh v. Amelung*, 309 S.W.2d 150 (Mo. App.1958), upon which appellants rely. Appellants emphasize that Count IV of their first amended petition alleged that, in addition to diverting, obstructing and changing the natural flow of the water in the Cuivre River, the artificial river and flood control devices constructed by Monsanto have the additional effect of *collecting* surface water into an artificial channel and *discharging* it in increased and destructive quantities upon appellants' property. Despite such allegations, the record is totally bereft of any evidence that Monsanto collected and discharged surface water in destructive quantities at any one point onto appellants' property. None of Monsanto's actions can be deemed violative of the modified common enemy doctrine's restriction on impounding or collecting and discharging surface waters.

Appellants' focus on the actions of Monsanto's engineers, and their attempt to characterize Monsanto's use of such engineers as negligent or reckless, is misguided. The proper inquiry under *Blydenburgh* is not *who* implemented the flood control devices but whether such devices collected and discharged water in destructive quantities at one point onto appellants' property. The evidence here shows no violation of the prohibition against collecting and discharging surface waters. Appellants' third point is denied.

Finding appellants' arguments to be without merit, we affirm the judgment of the trial court.

SMITH, P.J., and SATZ, J., concur.